UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CELANESE CORPORATION, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-06-2265 |
| | § | |
| COASTAL WATER AUTHORITY., *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM AND ORDER

This environmental clean-up case is before the court on the summary judgment

motions of defendants Coastal Water Authority (CWA) (Dkt. 72), Kellogg, Brown, & Root,

Inc. (KBR) (Dkt. 65), and Martin K. Eby Construction Company, Inc. (Eby) (Dkt. 74). The

motions have been thoroughly briefed, and all sides ably presented their positions at oral

argument on May 22, 2008. The court concludes that CWA's motion should be granted, and

KBR's and Eby's motions should be granted in part and denied in part.

## I.    Background

Celanese seeks recovery of costs it has incurred and will incur in the future due to a

methanol leak from a damaged pipeline in Shoreacres, Texas. Celanese discovered the leak

in 2002.

Celanese installed its methanol line in 1971. In the late 1970s, CWA contracted with

KBR to design and supervise installation of a 30" water pipeline. The CWA water line runs

5'-6' below and parallel to the Celanese line through an easement granted to CWA from

Exxon.  However, the CWA water line crosses the Celanese methanol line in an area just outside the Exxon corridor, on land owned by the Port of Houston.

Eby[1] is the contractor that excavated for installation of the CWA 30" raw water pipeline.  Celanese alleges that a backhoe operated by an Eby employee during that excavation hit and damaged its methanol pipe, leading to the leak Celanese discovered in 2002.  The methanol pipe was damaged in an area approximately 10 feet from the point where the two lines intersect.  Celanese alleges that CWA, KBR, and Eby knew about the damage to the pipe at the time it occurred, but hid it by backfilling over the damaged portion of methanol pipeline without informing Celanese.

Celanese has pending claims against CWA pursuant to § 361.344 of the Texas Solid Waste Disposal Act (SWDA), and against KBR and Eby pursuant to § 107 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), SWDA § 361.344, and common law fraud.[2]

## II.    Summary Judgment Standards

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The  party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial.  *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th

---

[1]    Eby is the successor in interest to a company called Chisholm Trial.

[2]    The court previously dismissed other claims asserted by Celanese in its amended complaint.  *See* Dkt. 45.

Cir. 2001).  Dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the nonmoving party.  *In re Segerstrom*, 247 F.3d 218, 223 (5th Cir. 2001).  "An issue is material if its resolution could affect the outcome of the action."  *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.,* 290 F.3d 303, 310 (5th Cir. 2002).

A summary judgment movant who bears the burden of proof on a claim must establish each element of the claim as a matter of law.  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  If the movant meets this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."  *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (quoting *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995)).

If the evidence presented to rebut the summary judgment is not significantly probative, summary judgment should be granted.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the nonmoving party.  *Id.* at 255.

In a non-jury trial, the judge is the ultimate trier of fact.  In such cases, the court may grant summary judgment where a trial would not enhance the court's ability to draw inferences and conclusions.  *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123-24 (5th Cir. 1978); *In re Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991).  The district court must be

aware that assessments of credibility, however, come into sharper focus upon hearing live witnesses. *Placid Oil*, 932 F.2d at 398.

## III.   Analysis

### A.   CWA's Motion for Summary Judgment

Celanese's only pending claim against CWA is pursuant to the SWDA. The elements of a SWDA cost recovery action are: (1) the defendant is a "person responsible for solid waste" as defined in § 361.271; (2) the TCEQ[3] approved the plaintiff's removal or remediation action;[4] (3) the action was necessary to address a release or threatened release of solid waste; (4) the costs of the action were reasonable and necessary; and (5) the plaintiff made reasonable attempts to notify the defendant of both the release and the plaintiff's intent to take steps to eliminate the release. *R.R. Street & Co., Inc. v. Pilgrim Enter., Inc.*, 166 S.W.3d 232, 240 (Tex. 2005). CWA contests elements (1) and (2).

---

[3]     The TCEQ, Texas Commission on Environmental Quality, is a successor agency to the TNRCC, or Texas Natural Resources Conservation Commission, the agency referenced in *R.R. Street*, 166 S.W.3d at 240.

[4]     The SWDA provides:

A person who conducts a removal or remedial action that is approved by the commission and is necessary to address a release or threatened release may bring suit in a district court to recover the reasonable and necessary costs of that action and other costs as the court, in its discretion, considers reasonable. This right is in addition to the right to file an action for contribution, indemnity, or both in an appeal proceeding or in an action brought by the attorney general.

TEX. HEALTH & SAFETY CODE § 361.344.

4

### 1.    Is CWA a person responsible for solid waste under § 361.271?

The SWDA creates liability for a person who:

> (1)    is the owner or operator of a solid waste facility;
>
> (2)    owned or operated a solid waste facility at the time of processing, storage, or disposal of any solid waste;
>
> (3)    by contract, agreement, or otherwise, arranged to process, store, or dispose of, or arranged with a transporter for transport to process, store, or dispose of, solid waste owned or possessed by the person, by any other person or entity at:
>
>> (A) the solid waste facility owned or operated by another person or entity that contains the solid waste; or
>>
>> (B) the site to which the solid waste was transported that contains the solid waste; or
>
> (4)    accepts or accepted any solid waste for transport to a solid waste facility or site selected by the person.

*Id*. § 361.271(a).[5]  CWA argues that it is not a person liable under the SWDA for Celanese's

removal or remediation costs.  Celanese argues that CWA is liable either as an operator

under subsection (1), or as an arranger under subsection (3).

***Operator liability*.**  The SWDA does not define "operator."  The court has not found,

and the parties have not cited, any Texas case law providing a definition or guidelines for

determining operator status.  For purposes of determining "arranger" status, the Texas

Supreme Court has concluded that guidelines developed in federal CERCLA cases are

---

[5]    While the jury is the fact-finder in an SWDA case, whether a person is liable as an owner, operator, transporter, or arranger is a question of law for the court.  *R.R. Street*, 166 S.W.3d at 240.

"faithful to the statutory language and purposes of SWDA." *R.R. Street*, 166 S.W.3d at 242-

43.  The court makes an *Erie* guess[6] that Texas would look to federal CERCLA cases for

guidance in determining "operator" status as well.[7]

> Under CERCLA, an operator is simply someone who directs the workings of,
> manages, or conducts the affairs of a facility . . . An operator must manage,
> direct, or conduct operations specifically related to pollution, that is, operations
> having to do with the leakage or disposal of hazardous waste, or decisions
> about compliance with environmental regulations. . . . For one to be considered
> an operator, then, there must be some nexus between that person's or entity's
> control and the hazardous waste contained in the facility.

*Geraghty and Miller, Inc. v. Conoco, Inc.*, 234 F.3d 917, 928 (5th Cir. 2000) (quoting *United*

*States v. Bestfoods*, 524 U.S. 51, 66-67 (1998).

Celanese relies on *Long Beach Unified School Dist. v. Dorothy B. Godwin Cal. Living*

*Trust*, 32 F.3d 1364 (9th Cir. 1994), for the proposition that an easement holder may be an

"operator" under CERCLA.  But that case provides little help to Celanese.  The Ninth Circuit

phrased the issue as "whether the holder of an easement burdening land which contains a

hazardous waste facility is, by virtue of that interest alone, liable for cleanup costs as an

'owner' or 'operator' under [CERCLA]." *Id.* at 1365.  After buying contaminated land, the

plaintiff school district  brought a CERCLA action to recover clean up costs.  The seller of

the land and the tenant that polluted it settled with the school district.  CERCLA claims

---

[6]    *SMI Owen Steel Co. v. Marsh USA*, 520 F.3d 432, 436-37 (5th Cir. 2008) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

[7]    CERCLA defines an "operator" only by tautology:  an operator is "any person operating [a] facility."  42 U.S.C. § 9601(20)(A)(ii).

against two other defendants who held easements to operate pipelines through the land, but did not contribute to the contamination, were dismissed on summary judgment by the district court.  The Ninth Circuit affirmed, holding that to be an "operator" of a hazardous waste facility, a party must do more than stand by and fail to prevent contamination.  Operator status means that a party "must play an active role in running the facility, typically involving hands-on, day-to-day participation in the facility's management." *Id.* at 1367-68.  Because the easement holders did not participate in the operation of the facility that caused the contamination, they were not liable as operators.

Here, as in *Long Beach*, the easement holder's pipeline did not leak.  Nor did CWA play an active role in operating the pipeline that did leak.  While CWA held an easement for its pipeline, it did not hold the easement for the purpose of operating a hazardous waste facility.  To avoid this problem, Celanese characterizes CWA as the operator of the excavation project for installation of its water line.  This characterization however, is not consistent with the SWDA's definition of "facility," which makes clear that a facility is comprised of land or improvements.  A "solid waste facility" means "all contiguous land, including structures, appurtenances, and other improvements on the land, used for processing, storing, or disposing of solid waste."  TEX. HEALTH & SAFETY CODE § 361.003(36).  So the operator of a *project* is not equivalent to the operator of a *facility* for purposes of SWDA liability.

In this regard, *United States v. Qwest Corp.*, 353 F. Supp. 2d 1048 (D. Minn), is instructive. In 1984, at a location known as the MacGillis Site, the EPA constructed wells for the extraction of contaminated groundwater and a series of forcemains, consisting of buried piping, for transport of contaminated groundwater to an on-site biological treatment unit. In 2000, Qwest arranged for installation of an underground communication line in a public right-of-way adjacent to the MacGillis Site. During installation by Qwest's contractor, the EPA's forcemains were ruptured, resulting in release of hazardous substances. *Id.* at 1049-50. The government argued that by controlling the drilling activities that damaged the forcemains, Qwest "operated" a facility that caused pollution. *Id.* at 1052. The district court rejected that argument, stating that Qwest did not conduct any activities relating to the handling and management of hazardous substances on the Site. Qwest did not control the forcemains; it was the EPA that operated the forcemains under the Supreme Court's *Bestfoods* standard. The accidental rupture of the forcemains, while potentially giving rise to liability under a different theory, did not transform Qwest into an operator of a facility. *Id.*

While recognizing that the court must interpret SWDA liberally to give effect to its remedial purpose,[8] the foregoing cases persuade the court that any negligence by contractors during construction of the water line does not transform CWA into an operator of a solid waste facility for purposes of SWDA liability.

---

[8]     *R.R. Street*, 166 S.W.3d at 238.

***Arranger liability***.  Section 361.271(a)(3) creates liability for an entity that arranges "by contract, agreement, or otherwise," to process, store, or dispose of solid waste.  There is no dispute that CWA did not contract or enter an agreement for the disposal of solid waste.  The issue is whether CWA otherwise arranged to dispose of solid waste by failing to tell Celanese about the damage to the methanol pipe, when it knew that the damage would lead eventually to a leak.

There is no bright-line rule for determining whether a party "otherwise arranged" to dispose of solid waste.  *R.R. Street*, 166 S.W.3d at 241.  Courts are in general agreement that there must be a nexus between the party's conduct and the disposal of the hazardous substance.[9]  *Id.* at 242.  That nexus has been found based on the party's authority, involvement, or obligation in regard to the disposal.  *Id.*  In evaluating whether the requisite nexus exists, courts look at the totality of the circumstances in each individual case.  *Id.*  "[T]he court['s] inquiry should focus on the degree of the defendant's actual control over the decision regarding the specific method or manner of disposal."  *Id.* at 243.

CWA argues that even if the pipe was damaged by a backhoe during excavation for CWA's water line, it was an accident, not an intentional disposal.  CWA relies on *Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 751 (7th Cir. 1993), in which the Seventh Circuit held that arranger status entails an intentional act.  Detrex hired a trucking company to

---

[9]    In contrast to operator liability, where the requisite nexus is between the defendant and the solid waste facility, for arranger liability the requisite nexus is between the defendant and the disposal of solid waste.

transport hazardous waste for treatment.  The trucking company spilled the waste on the ground.  The Seventh Circuit held that the words "arranged for" imply intentional action, and "it would be an extraordinary thing to make shippers strictly liable under the Superfund statute for the consequences of accidents to common carriers or other reputable transportation companies that the shippers had hired in good faith to ship their products."  *Id.*  CWA also relies upon *South Florida Water Management Dist. v. Montalvo*, 84 F.3d 402, 408-09 (11th Cir. 1996), which held that landowners contracting with pesticide sprayers did not arrange for the disposal of solid waste when the sprayers' actions contaminated a site.

In essence, CWA contends that it is insulated from liability because it merely contracted with KBR and Eby for the installation of a water line; it did not contract for or take any affirmative or intentional action to cause the leak of a hazardous substance.  CWA's position overlooks Celanese's primary factual contention in this case – that CWA, along with KBR and Eby, concealed from Celanese the damage to the pipe by backfilling over it.  If Celanese's contention is true, CWA arguably took affirmative and intentional action.  The critical issue then, is whether Celanese has presented sufficient evidence to create a genuine issue of material fact as to CWA's knowledge of damage to Celanese's methanol pipe.

Having reviewed the record, the court finds that Celanese has no more than a scintilla of evidence that CWA knew of damage to the methanol line and did not inform Celanese.  CWA representatives visited the site, but were not on-site everyday, and there is no evidence

that any CWA employee ever saw the exposed pipe.[10]   Although KBR had contractual

reporting obligations to CWA, there is no record of KBR reporting to CWA that Eby had hit

the methanol pipe.   KBR was CWA's "only eyes" on the project.[11]   In sum, this record

supports nothing more than that CWA, like Detrex, (*see* 2 F.3d at 751), and Montalvo, (*see*

84 F.3d at 408-09), contracted with entities that may have arranged for the disposal of solid

waste.   However, the court concludes that CWA itself is not an arranger responsible for solid

waste under § 361.271(3), and is entitled to summary judgment.[12]

### B.   KBR's and Eby's Motions for Summary Judgment

### 1.   SWDA and CERCLA Claims[13]

***TCEQ approval.***   As a threshold matter, Eby argues that Celanese has not satisfied

the first element of a SWDA cost recovery action, *i.e.*, TCEQ approval.[14]   There is no

dispute that at the time Celanese filed suit, and through the time of the summary judgment

---

[10]   Roberto Ramos dep. at 29; Watts dep. at 74.

[11]   Oradat dep. at 91.

[12]   In light of this holding the court need not reach other arguments advanced by CWA's motion.

[13]   The parties agree that Celanese's claims against KBR and Eby under CERCLA and SWDA are governed by the same guiding principles. *See R.R. Street*, 166 S.W.3d at 242-43.

[14]   Eby also argues that a cost recovery action must await completion of the remediation. Celanese cites *Vine Street LLC*, 460 F. Supp. 2d at 755 (E.D. Tex. 2006) for the proposition that a cost recovery action need not await completion of the cleanup.   In *Vine Street*, the court allowed the cost recovery action to proceed even though the removal action was an ongoing process.   As noted *infra* above, the plaintiff's agreement with the TCEQ under the Texas Voluntary Cleanup Program satisfied the approval element in that case.   In any event, the dispositive issue for accrual of the cause of action is approval, not completion of the removal or remediation action. TEX. HEALTH & SAFETY CODE § 361.344.

11

hearing, the TCEQ had not approved Celanese's remediation project.  In a supplemental filing, Celanese has presented evidence that TCEQ approved Celanese's Response Action Plan (RAP) on June 3, 2008.  This issue is effectively moot.

*__Factual disputes__*.  KBR's and Eby's primary argument for summary judgment attacks as purely speculative Celanese's theory that a backhoe damaged the methanol pipe during construction of CWA's water line.  Whether or not there is a genuine factual dispute on causation will drive the court's legal determination of whether KBR and Eby may be persons responsible for disposal of hazardous substances for purposes of SWDA and CERCLA liability.

In order to survive summary judgment, Celanese must present sufficient evidence to create a fact issue that the methanol pipe was damaged by a backhoe during construction of CWA's water line; KBR and Eby knew it; KBR and Eby did not inform Celanese of the incident; and KBR and Eby knew that such damage could lead to a leak years later.

The record reflects that the methanol leak occurred about 10-15 feet from the point at which the CWA water line crosses the Celanese methanol line, just outside of the Exxon pipeline corridor #550.[15] Although numerous pipelines run through the Exxon corridor, no other lines run alongside or cross the methanol line in the near vicinity of the damage.[16]

---

[15]     CLMP000962; CWA1978; Tower dep. at 83.

[16]     KBR000205.

While this proximity supports Celanese's position, it is by no means the only evidence Celanese offers.

There is evidence that Celanese's methanol line was exposed during the excavation for installation of CWA's water line. Celanese's expert testified that installation of the CWA line about 5 feet below the Celanese line would have necessitated exposure of the Celanese line in the area where the gash was located.[17] In its reply, KBR argues that even Towers concedes it is possible that the damaged section of the Celanese methanol line was not uncovered during the water line excavation. KBR misconstrues Towers's deposition testimony. Towers did say that the excavation "could have" been done in a way would not have exposed the methanol line, but it is his opinion that the methanol line was exposed, based on information he was provided indicating that the actual excavation was performed on a "1-and-one-half-to-1" slope.[18]

Moreover, when the methanol line was exposed for repair after Celanese discovered the leak, the excavators discovered the pipe was surrounded by a sand and concrete mix, the same material that was used to backfill the excavation for the CWA water line installation.[19]

One witness who saw the damaged methanol pipe opined that the methanol line was hit by a backhoe "digging perpendicular to the [Celanese] pipeline. His machine was facing

---

[17]     Tower report at 1; *see also* CLMP024244.

[18]     Towers dep. at 119; *see* Rosbel Ramos dep. at 49-50.

[19]     Benson dep. at 203-05; Tower report at 1.

west.  He was digging east . . . looking at the small boat channel, when he swung to his left and dug down, he came up (indicating), he stuck the pipeline."[20]  This description of the CWA excavation is supported by the testimony of Eby employees.[21]   And everyone seems to agree that the gash in the methanol line could have been caused by a backhoe.[22]

Celanese's proposed factual scenario is further supported by the report of Wayne Grip, whose expert analysis of aerial photos indicates that once the vegetation recovered from the CWA construction, it was not disturbed again until after the methanol leak was discovered in 2002.[23]  This tends to negate the possibility of subsequent excavation work by others at the leak site.

Based on the above, the court finds that Celanese has presented sufficient evidence to create a fact issue as to whether the methanol pipe was hit by a backhoe during excavation for the installation of the CWA water line.[24]  The court further finds a fact issue on the current record as to whether if the pipe was hit, KBR and Eby knew about it.[25]  There is no

---

[20]    Benson dep. at 208.

[21]    Roberto Ramos dep. at 13-14; Minks dep. at 90-91; Booker dep. at 28-29.

[22]    Oradat dep. at 65; Benson Dep. at 207; Bennett dep. at 84-85, 115-16.

[23]    Grip dep. at 85-86; Grip report, at 4-6.

[24]    KBR's own expert could not think of a more likely scenario.  Kocurek dep. at 9.

[25]    Olden dep. at 45-46 (KBR inspector on site every day and would have inspected pipe prior to cover up); Oradat dep. at 90 (KBR had resident inspector on site); Mink dep. at 107 ("if they were excavating or laying, then I was there"); Robert Ramos dep. at 27 (KBR was always there); Booker dep. at 50-51, 54 (if a backhoe operator hits a line, he and everyone
(continued...)

dispute that neither KBR nor Eby informed Celanese that a backhoe had hit the methanol line.  There is also no real dispute that a gash like that discovered in the methanol line could cause a leak years later.[26]

Given these genuine disputes of material fact regarding causation in fact, the next question is whether KBR and Eby fall within the scope of "arranger" liability under CERCLA's or SWDA's definition.

***Arranger liability.***  CERCLA and SWDA impose liability for the costs of cleaning up hazardous waste on (1) the owner and operator of a vessel or facility; (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of; (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

---

[25]     (...continued)
         in the vicinity will know it).

[26]     Egan dep. at 30; Dahlberg dep. at 56-58, 133-34; Villalobos dep. at 240; Rundle dep. at 65;.

42 U.S.C. § 9607(a)(1)-(4); TEX. HEALTH & SAFETY CODE § 361.271(a).  Celanese alleges

that KBR and Eby "otherwise arranged" for disposal of hazardous substances.

The Fifth Circuit has rejected a bright line test for determining arranger status, and has

mandated that the term be given a liberal interpretation. *Geraghty and Miller, Inc. v. Conoco,*

*Inc.*, 234 F.3d 917, 929 (5th Cir. 2000). The *Geraghty* opinion explained that "just as a nexus

must exist for operator liability to attach, there must also be a nexus that allows one to be

labeled an arranger."  That nexus has been described as "the *obligation* to exercise control

over hazardous waste disposal, and not merely the ability or opportunity to control the

disposal." *Id.* (quoting *General Elec. Co. v. AAMCO Transmissions, Inc.,* 962 F.2d 281, 286

(2d Cir. 1992) (emphasis in original)).  Needless to say, the statute itself contemplates that

this obligation can be generated "otherwise" than by contract or agreement.  To determine

arranger status, the court must engage in a case-by-case analysis considering the "totality of

the circumstances," no one of which is dispositive. *See Geraghty,* 234 F.3d at 929;

*Tanglewood East Homeowners v. Charles-Thomas, Inc.,* 849 F.2d 1568, 1573 (5th Cir. 1988)

(declining to decide which businesses and activities are covered by CERCLA as a matter of

law); *Sea Lion, Inc. v. Wall Chemical Corp.*, 974 F. Supp. 589, 595 (S.D. Tex. 1996) (listing

various factors considered by courts, such as ownership of the substance, intent of the parties,

the participants in the disposal decision, and authority to control the disposal).

Despite the somewhat nebulous nature of the *Geraghty* test for arranger status, the

court's holding provides ample guidance here.  The court there reversed  the district court's

16

summary judgment denying arranger status, and specifically based its ruling upon factual disputes regarding the actual cause of the contamination at the site:

> The parties dispute if and how the hazardous waste was moved by G&M at the Complex, including whether installation of the wells by G&M's subcontractor caused migration of the ethylene chloride. *Thus, the district court should not have entered summary judgment on this issue. See Burlington N.R.R. Co. v. Woods Indus., Inc.,* 815 F. Supp. 1384, 1392 (E.D.Wash. 1993) (even though lessee didn't bring hazardous waste to the site, if facts revealed that its instructions to third party caused waste to be dispersed across the site it would be subject to arranger liability).

*Geraghty,* 234 F.3d at 929 (emphasis supplied).

Similarly, the court concludes that if the fact-finder[27] accepts Celanese's version of events, then KBR and Eby may be held liable as arrangers for the disposal of hazardous substances in this case, and it will be necessary to allocate responsibility for clean up costs.[28]

KBR's and Eby's motions for summary judgment on Celanese's CERCLA and SWDA claims are denied.

### 2.    Common Law Fraud

The elements of a cause of action for fraud are:  (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made

---

[27]    There is no right to a jury trial under CERCLA; thus the court is the trier of fact.  This court defers making factual determinations for trial.  *See In re Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991).

[28]    Section 361.343 governs how costs incurred in an approved remediation will be allocated among responsible parties.  It is on this issue, not liability, that KBR's and Eby's evidence regarding Celanese's failure to properly monitor its line will be relevant.  *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 667-68 (5th Cir. 1990) (once liability is established, the court must ascertain each responsible party's equitable share of the cleanup costs).

it recklessly without regard to its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; (4) the plaintiff actually and justifiably relied upon the false representation; and (5) the plaintiff suffered injury. *Ernst & Young v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001).

A failure to disclose information constitutes fraud where the particular circumstances impose a duty to disclose the information. *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997); *Bright v. Addison*, 171 S.W.3d 588, 599 (Tex. App. – Dallas, 2005, pet. filed).  A duty to disclose may arise in four situations: (1) where there is a special or fiduciary relationship; (2) where one voluntarily discloses partial information, but fails to disclose the whole truth; (3) where one makes a representation and fails to disclose new information that makes the earlier representation misleading or untrue; and (4) where one makes a partial disclosure and conveys a false impression. *Columbia/HCA Healthcare Corp. v. Cottey*, 72 S.W.3d 735, 744 (Tex. App. – Waco, 2002, no pet.).[29]  Whether or not such a duty exists is a question of law. *Bradford*, 187 S.W.3d at 755.

---

[29]     Where there is a duty to disclose facts, fraud occurs if:  (1) a party conceals or fails to disclose a material fact within the knowledge of that party; (2) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth; (3) the party intends to induce the other party to take some action by concealing or failing to disclose the fact, and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact. *Daugherty v. Jacobs*, 187 S.W.3d 607, 618 n.3 (Tex. App. – 2006, n.p.h.) (citing *Custom Leasing, Inc. v. Texas Bank & Trust Co. of Dallas*, 516 S.W.2d 138, 142 (Tex. 1974).

The issue here is whether KBR or Eby had a duty to disclose the damage to the methanol line to Celanese.  Celanese contends that it had a special or fiduciary relationship with KBR and Eby.  A fiduciary is one who "occupies a position of peculiar confidence towards another." *Noell v. Crow-Billingsley Air Park Ltd. Partnership*, 233 S.W.3d 408, 414 (Tex. App.–Dallas 2007, pet. denied).  Fiduciary duties arise as a matter of law in certain formal relationships, such as between principal and agent, attorney and client, or partners, but may also arise in certain informal relationships.  *Id.*; *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos.*, 217 S.W.3d 653, 668 (Tex. App.–Houston [14th Dist. 2006] 2006, pet. denied).

> An informal relationship may give rise to a fiduciary duty where one person trusts in and relies on another, whether the relation is a moral, social, domestic, or purely personal one.  But not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship.  In order to give full force to contracts, we do not create such a relationship lightly. Accordingly, while a fiduciary or confidential relationship may arise from the circumstances of a particular case, to impose such a relationship in a business transaction, the relationship must exist prior to , and apart from, the agreement made the basis of the suit.

*Schlumberger Tech. Co. v. Swanson*, 959 S.w.2d 171, 176-77 (Tex. 1997) (internal citations omitted).  Subjective trust does not transform a business relationship into a fiduciary relationship.  *Id.*

19

The type of arms-length relationship between Celanese and KBR or Eby is not the type of formal or informal relationship that Texas recognizes as giving rise to fiduciary duties. There is no evidence that Celanese held KBR or Eby in "particular confidence."[30]

Whether or not KBR or Eby breached their duty to use reasonable care to avoid damaging pipelines during excavation for and installation of CWA's waterline is not the issue; this is not a negligence case. The issue is whether either KBR or Eby had a duty to disclose damage to the pipe to Celanese such that failure to do so gives rise to a claim for fraud. The court concludes that none of the four circumstances under which a duty to disclose arises are present in this case.[31] KBR and Eby are entitled to summary judgment on Celanese's fraud claim.[32]

---

[30]  To the contrary, Celanese argues that "inherent in the industry is the trust that is placed in others that do work around your pipeline, especially those that are knowledgeable in industry custom and practice and those that own, operate, and maintain pipelines in close proximity." Celanese's response to Eby' motion, at 26-27. The duty described by Celanese is a generalized industry duty, not one particularly owed by KBR and Eby to Celanese.

[31]  At the hearing, Celanese cited *Kadlec Med. Ctr. v. Lakeview Anesthesia Assoc.*, No. 06-30745, 2008 WL 1976591 (5th Cir. May 8, 2008), for the proposition that a duty to disclose arises where the withheld information affects human health and safety. Celanese's reliance is misplaced. First, *Kadlec* was decided under Louisiana law, which counsel concedes is different than Texas law on fraud. Second, *Kadlec* recognizes only a duty not to make an affirmative misrepresentation. *Id.* at *5. *Kadlec* in fact stands for the proposition that even though a former employer knew that its former employee posed a potential danger to his patients, it had no duty to disclose what it knew to potential future employers. *Id.* at *7. In its June 19, 2008 supplemental filing, Celanese relies upon *Hersum v. Keenebec Water Dist.*, 117 A.2d 3343 (Me. 1955), in support of the duty to disclose. Again, Celanese's reliance is misplaced. Aside from the fact that Maine law is not applicable here, *Hersum* is a negligence case, not a fraud case.

[32]  Eby also argues that Celanese's fraud claim against it is barred by Texas's 4-year statute of
(continued...)

### 3.    **Statute of Repose**

In further support of their motions for summary judgment, KBR and Eby argue that Celanese's SWDA claim is barred by the Texas statute of repose.    The court is not persuaded.

The Texas statute of repose provides that a claimant must bring a suit for damages "against a person who constructs or repairs an improvement to real property not later than 10 years after the substantial completion of the improvement *in any action arising out of a defective or unsafe condition of the real property or a deficiency in the construction or repair of the improvement.*" TEX. CIV. PRAC. & REM. CODE § 16.009 (emphasis added). Similar protection is afforded to an engineer who designs or plans the construction of an improvement to real property or equipment attached to real property. TEX. CIV. PRAC. & REM. CODE § 16.008.

By its own terms, the statute does not appear to target hazardous waste spills, but rather defective performance in the construction or repair of the real property improvement itself. The improvement here undertaken by KBR and Eby was the water line, not Celanese's methanol line. *Kerr v. Harris Cty.*, 177 S.W.3d 290 (Tex. App. [1st Dist.] 2005), and *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120 (Tex. 1996), cited by defendants, are not on point. In *Hood*, the Texas Supreme Court merely held that the statute of repose does not bar an action

---

[32]    (...continued)
limitations. TEX. CIV. PRAC. & REM. CODE § 16.004(a)(4). Because the court grants summary judgment on Celanese's fraud claim, it need not address the statute of limitations.

"based on willful misconduct or fraudulent concealment in connection with the performance of the construction." 924 S.W.2d at 121.  That case does not answer the question of whether the statute of repose applies at all in the situation at hand.  In *Kerr*, the court held that the claims of hundreds of homeowners against an engineering firm involved in the development of their subdivision for failing to provide sufficient storm water detention/retention were barred by the statute of repose.  177 S.W.3d at 296.  KBR argues that *Kerr* supports application of the statute in this case because in that case, as here,  the defendant had no contractual relationship with the plaintiffs.

But this case does not arise out of a defect in CWA's water line or a defect in the construction or repair of CWA's water line.  Neither KBR nor Eby are being sued for defective construction or repair of the water line improvement they were hired to perform.  The court concludes that the Texas statutes of repose do not bar Celanese's SWDA claim against KBR or Eby that are based on damages to the methanol line.

## IV.   **Conclusion and Order**

For the reasons discussed above, CWA's motion for summary judgment (Dkt. 72) is granted.  KBR's (Dkt. 65) and Eby's (Dkt. 74) motions for summary judgment are granted in part and denied in part.  Celanese's fraud claims are dismissed.  Celanese's SWDA and CERCLA claims against KBR and Eby remain pending.

Signed at Houston, Texas on July 2, 2008.


Stephen Wm Smith
United States Magistrate Judge