UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


CELANESE CORPORATION,          )     CASE NO:  CA-H-06-2265
                               )
               Plaintiff,      )            CIVIL
                               )
       vs.                     )
                               )         Houston, Texas
COASTAL WATER AUTHORITY,       )
ET AL,                         )      Friday, March 6, 2009
                               )    (10:25 a.m. to 12:54 p.m.)
               Defendants.     )
_____ )


STATUS CONFERENCE

BEFORE THE HONORABLE STEPHEN SMITH,
UNITED STATES MAGISTRATE JUDGE


Appearances:              See next page

Case Manager:             Jason Marchand

Court Recorder:           Ebonee' Mathis

Transcribed by:           Exceptional Reporting Services, Inc.
                          14493 S. Padre Island Drive
                          Suite A-400
                          Corpus Christi, TX 78418-5940
                          361 949-2988


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

**APPEARANCES FOR:**

Plaintiff:                    JOSEPH NASSIF, ESQ
                              CHARLES E. MERRILL, ESQ
                              Husch & Eppernberger
                              190 Carondelet Pl., Suite 600
                              St. Louis, MO 63105

                              ALISTAIR DAWSON, ESQ
                              Beck Redden & Secrest
                              1221 McKinney, Suite 4500
                              Houston, TX 77010

Defendants:                   NEIL KENTON ALEXANDER, ESQ
                              Porter & Hedges
                              1000 Main St., 36th Floor
                              Houston, TX 77002

                              GEORGE WILLIAM VIE, III, ESQ
                              JACK BROCK, ESQ
                              Mills Shirley
                              2228 Mechanic St. No. 400
                              Suite 400
                              Galveston, TX 77550

1    **Houston, Texas; Friday, March 6, 2009; 10:25 a.m.**

2    **(Call to Order)**

3    **THE COURT:**  We're here again on *Celanese Corporation*

4  *versus Coastal Water Authority;* Civil Action Number 06-2265.  I

5  won't go through taking names at this point.  I think we all

6  know and it looks like everybody's here for all the parties.

7    We have a couple of things to go over this morning.

8  The major thing is to talk about the objections to trial

9  exhibits.  And I've gone over the objections that were

10  presented by both sides last night.  I appreciate the way the

11  parties have kind of grouped those.  I think it makes it much

12  more effective to be able to talk about those in groups as

13  opposed to all one hundred or a couple of hundred

14  individualized exhibits.

15    Before we start through that process, and I hope it's

16  not going to take us that long this morning, there are a couple

17  of other things, smaller things I guess we could get to.  One

18  of the first things that I guess I'll ask Mr. Nassif about.

19    Your motion to take judicial notice of law, I'm a

20  little puzzled about that, Mr. Nassif.  Aren't courts bound to

21  take notice of what the law is and apply the law?  It struck me

22  as more a motion for judgment as a matter of law on certain

23  issues.

24    **MR. MERRILL:**  Your Honor, primarily our purpose for

25  this was to alert --

1          **THE COURT:**  You might want to identify yourself just

2    for the record.

3          **MR. MERRILL:**  Oh.  Charles Merrill for Celanese.

4          **THE COURT:**  Right.

5          **MR. MERRILL:**  Pardon me.

6          Your Honor, primarily the purpose for filing this was

7    to alert the Court to some law, particularly the state court

8    law or the regulatory law so you'd be aware of things we might

9    be referring to during the trial.

10         So far as our request for conclusions, I think you're

11   right; those are conclusions that we'll be asking the Court to

12   make at the end of the case.  I don't know that those need to

13   be ruled on at the present time --

14         **THE COURT:**  All right.

15         **MR. MERRILL:**  -- but it is what we'll be looking for.

16         **THE COURT:**  All right.  Well, then, I take it from

17   that that there's no need for me to be ruling on that up front

18   at this point.

19         **MR. MERRILL:**  No, I don't believe so, your Honor.

20         **THE COURT:**  All right.  So it doesn't call for a

21   response on the other side, so we won't need to go into that at

22   this point.

23         All right.  Well, of course we'll have other things

24   to talk about but I suppose the first thing to do, let's just

25   go ahead and get with it.  We'll take up the defendants'

1  objections to the plaintiff's exhibits at this point.  And as I

2  said, I think it's more helpful to go through these category by

3  category, so I'll go through them as the defendants have

4  grouped their objections.

5       The first category they've noted or that has been

6  noted are the CWA board minutes which has to do with Exhibit

7  Numbers 006, 011 and 030.  And as I understand it, well, I'll

8  let whoever speaks for the defendant just briefly outline what

9  the major problem with these.

10       Mr. Alexander?

11       **MR. ALEXANDER:**  Your Honor, this is Ken Alexander for

12  Kellogg Brown and Root.

13       The CWA board minutes which are in Exhibits 6, 11 and

14  30, and I believe I'm correct, those are all minutes that were

15  done in 2002 and 2003, contain hearsay within hearsay and they

16  are also just simply irrelevant to any matter pertinent to this

17  lawsuit.  CWA's no longer a party to this lawsuit and their

18  communications -- CWA's internal communications are irrelevant

19  to the claims.

20       I think that they are trying to say somehow that they

21  are relevant to notice to Kellogg Brown and Root but there's

22  not a word in those minutes about notice to KBR of anything,

23  much less that KBR was somehow responsible -- a responsible

24  party for Celanese's leak.

25       **THE COURT:**  All right.  For Celanese?

1          **MR. MERRILL:**  Your Honor, on these particular

2   exhibits, I note that on Exhibit 11, that's on our may-use list

3   and it's unlikely it would be used.  I think we could withdraw

4   that or would lay a foundation before raising it at trial.

5          **THE COURT:**  All right.  So the objection to Exhibit

6   11 then will be sustained.  And obviously all these, wherever I

7   sustain objections to exhibits, then the parties of course are

8   not to refer to those exhibits again.  You can revisit my

9   ruling but you'll need to approach the bench and obtain a new

10  ruling before being able to refer to those exhibits.

11         **MR. MERRILL:**  Okay.  As to Exhibits 6 and 30, first,

12  they're offered for a couple of reasons.  First, they're

13  offered to prove that Celanese gave notice to affected land

14  owners of the methanol release and the remediation.  This is an

15  element of compliance with a national contingency plan, and

16  these documents in the CWA minutes indicate that they were on

17  notice of both the release and the remediation.

18         **THE COURT:**  All right.

19         **MR. MERRILL:**  Second, we are attempting to prove

20  notice to KBR of the remediation and the release.  To do that,

21  we're going to have other evidence that's going to show that

22  CWA had communications with KBR concerning the methanol spill

23  situation.  The first step of that is showing what CWA knew

24  before they communicated with KBR.

25         **THE COURT:**  All right.  And as I understand it, the

1  parties have already agreed to waive any authenticity

2  objections to CWA exhibits --

3      **MR. MERRILL:**  Your Honor, the parties --

4      **THE COURT:**  -- and hearsay.

5      **MR. MERRILL:**  -- have stipulated to waive the

6  authenticity and the hearsay objection.  I think there's still

7  this remaining objection --

8      **THE COURT:**  Hearsay within hearsay.

9      **MR. MERRILL:**  -- is hearsay within hearsay, but my

10 point is that's offered to prove the fact that they were on

11 notice.

12     **THE COURT:**  All right.  I think this is basically a

13 relevance issue it seems to me, and I'm not inclined to be real

14 strict on that at this point, so I'm going to overrule the

15 objections to Exhibits 6 and 30.  So that takes care of the

16 first category.

17     The second category is hearsay and unsupported

18 statements re line location and excavation, and that has to do

19 with Exhibits 007, 116 and 340.

20     **MR. ALEXANDER:**  Your Honor, do you have a copy of

21 Exhibit 7?

22     **THE COURT:**  I've looked at it.  Let me pull it up on

23 the screen here.

24   **(Attorneys confer with one another)**

25     **THE COURT:**  Oh, okay.  No, I don't.  Okay.

1      **MR. MERRILL:**  I'm getting -- I'm going to try to pull

2  it up now.

3      **MR. ALEXANDER:**  If I can just hand up a copy there.

4    **(Mr. Alexander provides a copy of the exhibit to the**

5  **Court)**

6    **(The Court confers with the Clerk)**

7      **MR. MERRILL:**  I'm going to pull it up on the monitor.

8      **THE COURT:**  Okay.  All I've got do is look.

9      **MR. MERRILL:**  I have this on the monitor.

10     **THE COURT:**  Okay; there we go.

11     All right now, yeah, now it's working.  Go ahead.

12     **MR. ALEXANDER:**  Your Honor, this is a classic hearsay

13 document, and to understand why it is both inadmissible and

14 prejudicial to admit it, I need to explain a little bit about

15 who's writing whom here.

16     The substance of the document that they're trying to

17 introduce is an e-mail from Berndt Pederson to John Olden.

18 Berndt Pederson is a KBR employee at this time and so is John

19 Olden.  Mr. Pederson is reporting information to Mr. Olden that

20 he has gotten from Celanese and from somebody unknown at CWA.

21 The plaintiffs are trying to introduce this to somehow say that

22 the location of the leak in their line was ten to 15 feet from

23 the CWA line.

24     It's important for the Court to know that it is

25 undisputed that Mr. Pederson never went to the site.  The

1   information that he is reporting here in this e-mail is merely

2   things that people have told him over the phone and that he has

3   not independently verified or done anything about.  And so the

4   statements that are out of court statements made for the truth

5   of the matter asserted, that's what they're trying to do, and

6   they do not fall within any exception of the hearsay rule.

7          The cases that Celanese has cited to your Honor are

8   completely inapplicable.  In fact, we think they better support

9   our position that it's not -- that this document is not

10  admissible.  The cases that they cite are cases in which a

11  surveyor is employed by a party to go out and make a survey and

12  to report back the results that they find.  That's not what's

13  happened here.  All that's happened here is that Mr. Pederson

14  is reporting back what he's heard from Celanese and from CWA,

15  and so we think it would be prejudicial to admit this to the

16  jury and that it doesn't fall within an exception to the

17  hearsay rule.

18         They --

19         **THE COURT:**  Well Mr. Alexander, these are, as I read

20  this, these are Berndt Pederson's notes from a discussion with

21  someone at Celanese, right?

22         **MR. ALEXANDER:**  Correct.

23         **THE COURT:**  Okay.  Well, I guess I'll need to hear

24  from the other side as to the purpose they're being offered,

25  but could it not just be the purpose to reflect the contents of

1  that discussion --

2          **MR. ALEXANDER:**  Well, that they --

3          **THE COURT:**  -- which also has a bearing on knowledge

4  of something of that sort?

5          **MR. ALEXANDER:**  Mr. Pederson's knowledge about how

6  far the dent was from the CWA line is all hearsay.  He wasn't

7  there, he didn't see anything; he's just reporting what he's

8  been told by people who are in court to explain any of this.

9  That's hearsay.

10          **THE COURT:**  Uh-huh.  All right, I'll hear from

11  Celanese.

12          **MR. NASSIF:**  Your Honor, Joe Nassif.

13          First of all, your Honor, what's missing from the

14  explanation is Mr. Pederson was asked to go out and collect

15  facts by Mr. Olden, who was the KBR representative to

16  Celanese's project.  Mr. Olden was actually the person who

17  oversaw the installation of the CWA line in 1979, and when they

18  were notified that the line had been hit and that Celanese had

19  advised CWA that they believed that CWA had hit the line, Mr.

20  Rundel, who has a copy of this e-mail, has a conversation with

21  Mr. Olden, and Mr. Olden instructs Mr. Pederson to go out and

22  collect information and report back.  Some of that information

23  has to do with their knowledge that the cleanup was going on

24  under the Texas Risk Reduction Act, which is important in this

25  case, your Honor, because it indicates that they were -- KBR

1    was aware that the cleanup was being conducted, not just CWA.

2          It's also important, Judge, in that I believe it does

3    come within the cases we have cited because he was actually

4    instructed to go out and conduct -- pull information together,

5    which is similar to the cases that we've reported to the Court.

6    And in addition, Judge, he was a geological engineer, so he

7    wasn't a surveyor but he was a geological engineer that was

8    asked to conduct these interviews and come back.

9          And if you see, Judge, in addition to there being

10   statements from CWA and statements from Celanese, there are

11   also sections where I believe he identifies them as BP, and

12   you'll see that on the document, Judge.  Those are actually his

13   comments, so it's not just what he heard from others; it was

14   actually in part comments that Mr. Pederson concluded and he

15   passed this information forward.

16          I think it is important, Judge, on the question of

17   knowledge.  It's important as well that it was an investigation

18   that was conducted following the report of the accident and

19   release of material in 2002.

20        **(Attorneys confer with one another)**

21          **THE COURT:**  Mr. Alexander?

22          **MR. ALEXANDER:**  Mr. Nassif has made some

23   representations, your Honor, that are incorrect, and maybe it

24   was just because he wasn't at Mr. Pederson's deposition.  What

25   Mr. Pederson testified to in his deposition was he wasn't told

1  anything about a hit on the CWA line, as Mr. Nassif has

2  characterized.  What he was told was that there had been a leak

3  in the CWA line and there was concern about the impact that

4  that leak would have on the CWA line.  That's what he was told.

5          And he was a geotechnical engineer and he was asked

6  to gather some information about that.  He was not -- It

7  doesn't go at all to notice of a hit on the Celanese line or

8  any inference that KBR was put on notice that they were being

9  accused of having participated in a hit on the line.  Quite the

10  contrary, all he was doing was to find out whether their

11  methanol was going to have an adverse impact on the CWA line.

12          **MR. UNIDENTIFIED:**  I'm sorry, Ken.

13          **MR. ALEXANDER:**  So there's no question, your Honor,

14  about why they want this document in.  It is because they never

15  surveyed the location of the leak, and they are trying to use

16  this hearsay statement that Mr. Pederson couldn't even remember

17  who had said to him much less know what the source of that

18  information was about the ten to 15 feet from the intersection.

19  That's why they want it.

20          And it doesn't stand for the notice question that Mr.

21  Nassif has asserted because there was no such notice.  All that

22  KBR was told or all that Mr. Pederson was told was about a

23  leak, not any claim that KBR had hit it or anything of the

24  kind.

25          **THE COURT:**  All right.

1      **MR. DAWSON:**  Your Honor, may I respond?

2      **THE COURT:**  Briefly, yeah.  Go ahead, Mr. Dawson.

3      **MR. DAWSON:**  Maybe I'm missing something.  This is

4  from their employee.  It's the admission of a party opponent.

5  And if it's not that, it's a statement against interest, the

6  fact that their line was, you know, ten to 15 feet away.

7      And the other point, your Honor, is what's going to

8  become important I think, at least to me it's important, is Mr.

9  Pederson makes statements in here about how he told them,

10  'You're not allowed to go down and get anywhere near the CWA

11  line.'  Now, they're going to try and convince this jury that

12  the CWA line was nowhere near the place where the Celanese line

13  was dented, but at the time they were doing the excavation,

14  they were telling Celanese, 'Don't you go anywhere near our

15  line.  Don't you go down any deeper; we're going to have a man

16  here watching so you don't touch our line', and that's

17  circumstantial evidence that the line was hit near the

18  intersection of the CWA line --

19      **THE COURT:**  Yeah.

20      **MR. DAWSON:**  -- which is what we're (indiscernible)

21  on, but it's an admission of a party opponent is the easiest

22  answer.  And it's their witness.

23      **THE COURT:**  Why --

24      **MR. DAWSON:**  If they want to bring him in and say,

25  you know, that's what -- You know, I wasn't there and I didn't

1  see it and offer whatever explanation, they can bring him in.

2          **THE COURT:**  Right.

3          **MR. ALEXANDER:**  Mr. Dawson seems to have forgotten

4  that CWA is not a party to this lawsuit anymore.

5          **MR. UNIDENTIFIED:**  Well, (indiscernible) is.

6          **THE COURT:**  Well, Mr. Pederson is a KBR employee.

7          **MR. ALEXANDER:**  KBR is.

8          **MR. UNIDENTIFIED:**  I'm sorry?

9          **THE COURT:**  Excuse me; Mr. Pederson is a KBR

10  employee.

11          **MR. ALEXANDER:**  That is true but it's not Mr.

12  Pederson's statement.

13          **THE COURT:**  Well, it is his memo.

14          **MR. ALEXANDER:**  It's his memo but he's reporting what

15  somebody -- an unnamed person at CWA has said.  It's not a KBR

16  statement.

17          **THE COURT:**  Well, maybe he's vouching for somebody

18  else.  And is that not an admission or a statement against

19  interest?

20          **MR. ALEXANDER:**  It is undisputed that Mr. Pederson

21  never went to the site of the excavation where the site was.

22  He never -- It's also undisputed he never saw even a

23  photograph.

24          **THE COURT:**  Okay.  Is Mr. Pederson available --

25          **MR. ALEXANDER:**  So there's no way

1        **THE COURT:**  -- to testify?

2        **MR. ALEXANDER:**  I'm sorry?

3        **THE COURT:**  Mr. Pederson will be available to

4   testify, right?

5        **MR. ALEXANDER:**  Mr. Pederson is out of the country at

6   the moment.

7        **MR. UNIDENTIFIED:**  Oh, come on.

8        **MR. ALEXANDER:**  And he is --

9        **THE COURT:**  Counsel, that's -- let's hold down the

10  sidebar.

11       **MR. ALEXANDER:**  As I have told Celanese's counsel, he

12  anticipates being back in the country for one week, not this

13  week but the following week.

14       **THE COURT:**  All right.

15       All right, I'm going to overrule the objections to

16  Exhibit 7.

17       **MR. BROCK:**  Excuse me, your Honor; could I be heard

18  just very briefly?

19       **THE COURT:**  Yes, sir, yes, sir.

20       **MR. BROCK:**  I think on --

21       **THE COURT:**  Identify yourself --

22       **MR. BROCK:**  Jack Brock.

23       **THE COURT:**  -- for the record, Mr. Brock.

24       **MR. BROCK:**  Jack Brock for Martin K. Eby.

25       Your Honor, my concern on behalf of Eby is if you

1  look at the document on its face, it is a hearsay document.

2  The only sections I've heard for admissibility are notice as to

3  KBR and an admission against interest as to KBR.  Neither of

4  those are applicable to me, and so we're in a situation where

5  we have, clearly, a prejudicial statement that is a hearsay

6  statement where none of the exceptions are applicable to my

7  client.  That's my concern with the admission of the document.

8          **THE COURT:**  All right.  Briefly, Mr. Dawson.

9          **MR. DAWSON:**  Even if the Court wants to give an

10 instruction that this is a document, you know, put forth by

11 KBR, that's fine.

12         **THE COURT:**  All right.  All right, that might be the

13 way to handle that, but, again, I'll overrule KBR's objections

14 or the defendants' objections to Exhibit 7 with perhaps the

15 possibility of a limiting instruction to the jury that it is a

16 KBR document, not an Eby document.

17         All right, what about Exhibit -- the other exhibits

18 in this category, 116 and 340?  Exhibit 116 and 340 is a

19 Celanese report, is that right?

20         **MR. BROCK:**  116 and 340 are, to my understanding, the

21 same exhibit, Judge.

22         **THE COURT:**  The same exhibit.

23         **MR. BROCK:**  It is a memorandum from Sean Moore of

24 Celanese who is -- was the project manager for the remediation

25 or the excavation following the discovery of a leak.  It's

1   dated October the 24th of 2002, in which he makes a number of

2   representations concerning matters associated with the

3   excavation, including the location, the respective locations of

4   the lines.

5           He makes one statement in which he says that the leak

6   is approximately ten feet from the CWA line and that the

7   excavation of the CWA line would have uncovered this area.

8   Upon examination in his deposition, Mr. Moore acknowledged that

9   this concept that it was ten feet from the location of the CWA

10  line was nothing more than guesstimate on his part.  And he

11  further stated that it was not something that -- it was nothing

12  other than just a glance down.  And then secondly -- I'm sorry,

13  with respect to whether the CWA excavation would have uncovered

14  this area, he said clearly he had no basis for that statement.

15          So I --

16          **THE COURT:**  Mr. Moore's going to be called as a

17  witness?

18          **MR. BROCK:**  We're going to call him on our portion of

19  the case on the defense.  The concern of course is it coming in

20  in advance, plaintiff's relying on it heartily throughout their

21  case, and then Mr. Moore comes in and we don't have the

22  opportunity to cross examine him about it until a week and a

23  half after the case has been ongoing.

24          **THE COURT:**  Well, I don't think that's necessarily so

25  prejudicial as to warrant its exclusion, so I'll overrule the

1    objection to Exhibit 116, which is also Exhibit 340.

2        **(Plaintiff's Exhibit Number 116/340 was received in**

3    **evidence)**

4            **THE COURT:**  Okay, that takes us to the third category

5    of documents, other construction-related documents, Exhibits --

6    I guess for the record let me go ahead and read these numbers

7    in.  Exhibits 31, 32, 39, 40, 54, 58, 61, 62, 63, 64, 66, 68,

8    69, 76, 320 and PX-62.

9            All right, do the defendants want to speak to these

10   objections?

11           **MR. ALEXANDER:**  Your Honor, I think it's the

12   plaintiff's position that they will lay the foundation with

13   respect to 320 and PX-62, so I don't think they are at issue

14   today.

15           With respect to the other items, these have to do

16   with other changes that were done on the CWA pipeline, have

17   nothing to do with the area in which Celanese's line leaked.

18           **THE COURT:**  Yeah.

19           **MR. ALEXANDER:**  The argument as I understand it for

20   why the plaintiffs are saying this is relevant is somehow to

21   show that KBR didn't do a good job on some other areas of

22   locating particular underground structures or that sort of

23   thing, or that Eby didn't -- Chisholm Trail didn't do a good

24   job of locating underground structures in other locations

25   because they weren't shown correctly on the drawings or that

1    kind of thing.

2            This is a --

3            **THE COURT:**  But it does have to do with this project,

4    right?

5            **MR. ALEXANDER:**  It does have to do with this project.

6    It just has nothing --

7            **THE COURT:**  Just other aspects of this project than

8    the --

9            **MR. ALEXANDER:**  It has nothing to do with the area

10   where Celanese's line crossed the -- Celanese's line 62, the

11   methanol line, crossed the CWA line.

12           **THE COURT:**  Okay.

13           **MR. ALEXANDER:**  It is -- The reason that it's

14   immaterial for these documents to come in, and it's just going

15   to be a great diversion, is that it's undisputed that the

16   Celanese line was properly identified on the drawings that Eby

17   had to work with at the time that they were doing the

18   excavations near the Celanese line.

19           **THE COURT:**  All right.

20           **MR. ALEXANDER:**  So whether some other spot was well-

21   marked or not is irrelevant.

22           **THE COURT:**  Well, I understand.  You may well be

23   right that it's not worth spending a lot of time on, but I'm

24   not going to rule at this point that it's so irrelevant that it

25   can't come in.

1          I will caution the plaintiffs that I'm not going to

2    be real patient about hearing a lot of testimony or a lot of

3    emphasis placed on documents that I think are probably more

4    background than anything else, but I think documents related to

5    the project or documents related to these pipelines that are an

6    issue are going to come in.  Documents related to other

7    projects or related to other pipelines are, in general, not

8    going to come in.  So with that, I think I'll overrule the

9    objections to the rest of these documents.

10          Let me hear from the plaintiff with regard to the two

11   documents in this category, 320 and PX-062, that Mr. Alexander

12   said you've apparently reached some sort of agreement that --

13          **MR. NASSIF:**  Yes, Judge; we'll lay a foundation.

14          **THE COURT:**  You'll lay the foundation for that, all

15   right.

16          **MR. NASSIF:**  Judge, do you want me to clarify at all

17   why we might go into the documents you've just overruled?

18          **THE COURT:**  Well all right, you might take a moment.

19          **MR. NASSIF:**  Just to give you two seconds on that.

20          **THE COURT:**  All right.

21          **MR. NASSIF:**  First of all, there is an issue about

22   whether the Celanese line was properly identified.  But more

23   importantly, these documents lay a foundation for a series of

24   issues that were being confronted and were driving the issue of

25   getting the project done on time, and that's kind of the point,

1    and we'll get through them quickly, Judge, but that's more what

2    these documents are related to, is to other things that were

3    not in the correct location and how that delayed the project.

4            **THE COURT:**  Okay.  And what about the exhibits --

5    Okay, you're going to lay the foundation for Exhibits 320 and

6    PX-062?

7            **MR. NASSIF:**  Yes, Judge.

8            **THE COURT:**  All right.

9            All right, the next category, category four, court

10   documents, affidavits, transcripts, and an article.  Here I'm

11   going to have to be persuaded by the plaintiffs as to why these

12   things ought to come in.  I'll hear from --

13           **MR. MERRILL:**  Your Honor, these will all be

14   withdrawn.  PX-035 would be used for cross examination only.

15   Exhibit 243 we would lay a foundation if we attempted to

16   introduce it, and all of the other exhibits will be withdrawn.

17           **THE COURT:**  Okay.  Let me read those exhibit numbers

18   for the record then in this category.  Exhibits 243, Exhibit

19   317, 322, 339, PX-022, PX-035 and PX-118.

20           Okay now, counsel, can you go through again which

21   ones you're withdrawing?

22           **MR. MERRILL:**  Yes, your Honor.  We're withdrawing

23   317, 322, 339, PX-022, and PX-18.

24           **THE COURT:**  All right.

25           **MR. UNIDENTIFIED:**  One eighteen.

1          **MR. MERRILL:**  One eighteen, excuse me.  PX-035 would

2    only be used in cross examination, if at all.

3          **THE COURT:**  All right.

4          **MR. MERRILL:**  And Exhibit 243, we would lay a

5    foundation before I introduce it.

6          **THE COURT:**  Okay.  All right, so I think that takes

7    care of category four.

8          Okay, category five, Celanese construction documents

9    PX-053, PX-054, and PX-055.

10         Mr. Alexander, or someone for the defendants, on

11   these?

12         **MR. ALEXANDER:**  Give me just a moment, your Honor,

13   and let me look at these here.

14      **(Pause - attorneys confer with one another)**

15         **THE COURT:**  Actually, my notes here -- let me go to

16   the plaintiffs.  These appear to be unrelated to the CWA line,

17   are they not?  I mean, how are these documents related or what

18   relevance --

19         **MR. NASSIF:**  Judge, they are actually related because

20   these are the original documents that go to the original

21   construction of the Celanese line that was impacted in 1971.

22   And Judge, the reason they're related is the defendants have

23   periodically made the allegation that the line could have been

24   hit during the installation of the -- original installation of

25   the line in 1971.  And what these documents establish and what

1   KBR wants to admit, they're the ones that installed the line in

2   1971.

3          What these documents establish is that the line was

4   installed in 1971 by KBR, and that coatings and things were put

5   on the lines, and that's what these documents show.  We're not

6   going to use them unless there becomes an issue about whether

7   or not the line was damaged during installation.

8          **THE COURT:**  Mr. Alexander?

9          **MR. ALEXANDER:**  Your Honor, I'll remind Mr. Nassif of

10  his pleadings.  His pleading is that we damaged the line in

11  1979 in connection with building the CWA line.

12         **THE COURT:**  You need to speak up some.

13         **MR. ALEXANDER:**  I'm sorry.

14         **THE COURT:**  That's all right.

15         **MR. ALEXANDER:**  Mr. Nassif's allegation -- Celanese's

16  allegation is that his line was damaged in 1979, actually the

17  pleading says 1978 but I think it's undisputed that the actual

18  construction was in 1979, in conjunction with the construction

19  of the CWA line, okay.

20         He doesn't have an allegation and we have not tried

21  this lawsuit on the basis that Brown and Root was responsible

22  for dinging his line when it was put in originally.  In fact,

23  Mr. Nassif's statement that Brown and Root put in the line is

24  incorrect.  It is true that Brown and Root did work but it is

25  not true that Brown and Root laid the line.

1          **THE COURT:**  Is that Chisholm Trail that put that in?

2          **MR. ALEXANDER:**  I'm sorry?

3          **THE COURT:**  Which entity put that in?

4          **MR. ALEXANDER:**  My recollection is an entity called

5     Murray Pipeline Company.

6          **THE COURT:**  Okay.  But you're not going to contend

7     that there's a possibility that damage occurred back in 1971?

8          **MR. ALEXANDER:**  Absolutely I'm going to say to the

9     jury that they have not excluded the possibility that the line

10    was damaged in conjunction with its original construction.

11    Absolutely I'm going to say that.

12         **THE COURT:**  Okay.  Well, if you say that, then it

13    seems to me these documents may have some relevance.  These are

14    1971 documents.

15         **MR. ALEXANDER:**  It's undisputed that they put in a

16    line, okay?  They don't need these documents to establish that

17    they put in a line.  I think it's going to be confusing to the

18    jury, and certainly they should be prohibited from arguing,

19    that if the damage occurred in 1971 when the line was put in,

20    as opposed to 1979, that that's our fault too.

21         **THE COURT:**  Mr. Nassif?

22         **MR. NASSIF:**  My point is, Judge, is we're entitled to

23    show that when the line was put in in 1979, there was coating

24    put on it, it was properly installed as far as --

25         **THE COURT:**  In 1971?

1          **MR. NASSIF:**  1971, I'm sorry, Judge.  And that in

2     fact they were the ones that oversaw the line and that's the

3     purpose of it if they're going to make that defense.  If

4     they're not going to make that defense, then we'll take the

5     documents out.

6          **THE COURT:**  All right.  Well, based on what I'm

7     hearing then, it may have some relevance to the arguments of

8     the parties, and so I will overrule the objections PX-53, 54

9     and 55.

10          Okay, that takes us to category six.

11          **MR. UNIDENTIFIED:**  Your Honor, I just would mention -

12     -

13          **THE COURT:**  Yes, unless you want to revisit.

14          **MR. UNIDENTIFIED:**  With respect to this category

15     five, they had already said that they're going to lay the

16     foundation with PX-55.

17          **THE COURT:**  All right.  You're going to -- All right,

18     with respect to Exhibit 55 then.  Is that correct, Mr. Nassif?

19          **MR. NASSIF:**  We don't have a recollection of that

20     (indiscernible).

21          **THE COURT:**  What is Exhibit --

22          **(Laughter)**

23          **THE COURT:**  What is PX-55?

24          **MR. NASSIF:**  Judge, that is a document that goes

25     through -- they're purchase orders, a series of purchase orders

1   in care of Brown and Root for getting the materials together in

2   order to install the line.  They talk in those documents,

3   Judge, about putting a coating on the 10-inch and the 8-inch

4   lines.

5          **THE COURT:**  Okay.  All right.  Well then I'll

6   overrule that objection to 55 as well.

7          **(Plaintiff's Exhibit Number 55 was received in evidence)**

8          **THE COURT:**  All right, category six, documents not

9   previously produced.  Mr. Nassif, why should I let these in if

10  you didn't produce them until January of this year?

11         **MR. MERRILL:**  Judge, PX-068 will be withdrawn.

12         **THE COURT:**  Okay.  PX-068 is withdrawn.  And the

13  other one is PX-067?

14         **MR. MERRILL:**  PX-067 is a document that in its

15  present form was not previously produced during the production

16  in this case, but it was -- we made it -- Celanese made a

17  massive production from its SAP database and from its corporate

18  database.  It was subject to a protective order because it has

19  everything under the kitchen sink in it.  It's a massive

20  production.

21         And of course, in prepara --

22         **THE COURT:**  I'm sorry.  So it was produced or was

23  not?

24         **MR. MERRILL:**  The data was produced but --

25         **THE COURT:**  But not in this format?

1      **MR. MERRILL:** -- not in this format.  You go to these

2  electronic documents; I asked one of my -- one of the witnesses

3  who will be at the trial, 'Can you find me some information on

4  this?', and he went to that database and extracted these

5  documents in the form that I've now produced.

6      **THE COURT:**  All right.

7      **MR. MERRILL:**  So we believe that the information has

8  been produced in the production of the Celanese database.

9  These documents had not been produced in this format which is

10  why I delivered them to the defendants on this CD back in

11  January.

12      **THE COURT:**  All right.  Mr. Brock?

13      **MR. BROCK:**  Your Honor, what this is relevant to is

14  one of the issues is whether or not Celanese properly monitored

15  losses in its pipelines, and there were a series of transfer

16  logs where they showed the amount that went into the pipeline

17  and the amount that came out, and there are great deltas in

18  those numbers over a period of time.

19      We asked for a long period of time to get as many of

20  those records as we could in order to try to calculate how much

21  was actually lost and whether they had notice or should have

22  had notice of this loss.  We were only provided transfer logs

23  from 2001 and 2002; they said that's all they could find.

24      And so these documents, they've now gone apparently

25  and found other documents that relate to transfers going back I

1  think to 1995 or so, that, as he acknowledges, had not been

2  produced before.  They apparently added those at the -- you

3  know, when the pretrial was filed, and we've had no opportunity

4  to cross examine anybody about it.  He says, 'Well, the data

5  was there somewhere' in this huge, massive electronic

6  production that they gave us, but that would require us to go

7  through to pull it all out.  The documents simply have not been

8  produced and we think it's prejudicial.

9        **THE COURT:**  All right, I'll sustain the objections to

10  PX-068 then, and 06 -- No, PX-068 has been withdrawn; PX-067,

11  the objection will be sustained.

12        Category seven, environmental remediation related

13  documents.  These apply to Exhibits 86, 91, 141, 153, 313, and

14  PX-1, 2, 3, 4, 14, and 15.  I'll hear from the defendants on

15  these.

16        First of all, my question I guess first of all is why

17  are not -- why are these documents not relevant, these

18  environmental remediation documents?

19        **MR. MERRILL:**  Your Honor, we've reached an agreement

20  --

21        **THE COURT:**  Oh, you have?

22        **MR. MERRILL:**  -- somewhat on many, many parts of this

23  this morning, and maybe I'll just announce what I think it is

24  and Mr. Aycock can speak to that and then we'll --

25        **THE COURT:**  Great.

1          **MR. MERRILL:**  Exhibit PX-01 is the APAR.  It's a two-

2     volume set; it's about this thick **(indicates)**, and we've agreed

3     that I will not introduce that document into evidence.  The use

4     I plan to make of it, I would like to display it to the jury,

5     and it will not be in evidence, it won't go to the jury room.

6          It may be that I may need to have a piece of data

7     from one page of it that I would extract and lay a foundation

8     for, but other than, PX-01 will be withdrawn.

9          **THE COURT:**  So just for display purposes only then?

10          **MR. MERRILL:**  Right, right.

11          **THE COURT:**  All right, that's fine.  Okay.

12          **MR. MERRILL:**  As to PX-02, PX-03, and PX-04, the

13     defendants have withdrawn their objection except that there are

14     a couple of duplicates -- 153, and I think it's 313 -- and

15     we've agreed that we'll eliminate one of the duplicates, so

16     we're only going to use one version of the document.  We'll use

17     the best quality one.

18          **THE COURT:**  All right.  Is that correct, counsel?

19          **MR. UNIDENTIFIED:**  Yes, it is.

20          **THE COURT:**  All right.  All right, so PX-2, 3, and 4

21     then will be admitted subject to elimination of the

22     duplication.

23          **(Plaintiff's Exhibit Numbers PX-2, 3, and 4 were received**

24     **in evidence)**

25          **MR. MERRILL:**  And then --

1          **MR. ALEXANDER:**  Your Honor, if I can clarify one

2    thing?

3          **THE COURT:**  Yes, sir.

4          **MR. ALEXANDER:**  On PX-3, we are in discussion with

5    counsel about there appears to be some pages maybe missing out

6    of it.  We're working together to get a complete copy of that.

7          **THE COURT:**  All right.

8          **MR. ALEXANDER:**  I think if PX-4, did you say, Mr.

9    Merrill?  Did you say that's the one in color?

10         **MR. MERRILL:**  Yes, (indiscernible), yes.

11         **MR. ALEXANDER:**  And PX-4 is coming in, and just so

12   the record's clear, I think 315 will be withdrawn.

13         **MR. MERRILL:**  Correct.  And PX --

14         **THE COURT:**  So Exhibit 313 will be withdrawn?

15         **MR. MERRILL:**  Yes.

16         **THE COURT:**  All right.

17         **MR. ALEXANDER:**  And then also 153 will be withdrawn

18   too.

19         **THE COURT:**  All right.

20         **MR. MERRILL:**  Correct.  And Exhibits 186 and --

21         **THE COURT:**  You mean 86?

22         **MR. MERRILL:**  Excuse me, 86, 91, and 141 we will

23   withdraw.

24         **THE COURT:**  Okay.  So those Exhibits 91 -- or

25   Exhibits 86, 91, and 141 are withdrawn also.  Okay.

1          So what does that leave us to fight about on this

2   category?

3               **MR. ALEXANDER:**  Your Honor --

4               **THE COURT:**  PX-14 and 15?

5               **MR. ALEXANDER:**  Your Honor, we'll withdraw our

6   objections on PX-14 and 15.

7               **THE COURT:**  Okay.  So the defendants are withdrawing

8   their objections to PX-14 and 15.

9          All right, so by my count this takes care of this

10  category, is that correct?

11              **MR. ALEXANDER:**  Yes, your Honor.

12              **THE COURT:**  All right.  Very good.

13         Then category number eight, business record

14  affidavits; and this relates to a lot of Exhibits: PX-72, 73,

15  74, 76, 77, 79, 79-C, 80, 80-C, 81, 83, 84, 85, 87, 88, 89-B,

16  90, 92, 93, 93-C, 94, 95, 99-B, 100, 104, 105, 108, 109, 110,

17  111, and 112.

18              **MR. ALEXANDER:**  Your Honor, for these exhibits that

19  you just listed, they've attached a business record affidavit

20  to the invoices.  We don't have a problem with the invoices

21  themselves not being hearsay.

22              **THE COURT:**  Right.

23              **MR. ALEXANDER:**  We feel that the business record

24  affidavit takes care of that.

25         We are a little concerned about the affidavit itself

1    going back to the jury, primarily because it has a statement in

2    most of these affidavits that the amounts charged were

3    reasonable and necessary.  We are concerned that the jury may

4    get the impression from that statement being in these

5    affidavits, if they go back, that that somehow takes care of

6    their obligations to prove that they are entitled to get

7    expenses that are attached to the affidavit.

8         **THE COURT:**  Can't we take care of that with an

9    instruction or make that clear to the jury?

10        **MR. ALEXANDER:**  Your Honor, I think, you know, we

11   could send the affidavit back redacted would be one option; an

12   instruction might do it.  We're a little concerned they can

13   just -- you know, they're going to have so much paper back in

14   the room and these invoices take up a significant amount of

15   binders, that we're concerned they'll look at the affidavit and

16   say 'reasonable and necessary', and they'll just move on to the

17   next one.

18        **THE COURT:**  I'll hear from the plaintiffs.

19        **MR. MERRILL:**  Your Honor, I kind of agree and

20   disagree with that.  The agreement is that I don't believe that

21   the jury needs to see the affidavit, but on the other hand I

22   very much am urging that the affidavits do in fact establish a

23   prima facie case on the issue of necessity and reasonableness

24   of these invoices.  That's why in my brief I briefed the issue

25   of Texas Civil Practice and Procedure Rule 18.001.  And the

1    affidavits that have been submitted are in the form that's

2    prescribed in that statute and lay the predicate for these

3    exhibits being admitted for proof of reasonableness and

4    necessity.  I think that's done without the affidavits

5    themselves having to be items that are in evidence.

6         You know, this is just -- if it's a management of

7    paper problem, you know, I can work with that in a number of

8    different ways, but I very much do urge these affidavits as

9    establishing a prima facie case.

10        **THE COURT:**  I don't think there's any question the

11   affidavits come in, and I'm not that concerned about the

12   particular reasonableness and necessity statement in there.  I

13   think we can handle that either by an instruction or, if the

14   parties want to agree to redact that particular portion of

15   that, you know, you want to go through all those affidavits and

16   do that.  I'll leave that to the parties if you want to work

17   that out.

18        **MR. ALEXANDER:**  If we can just clarify one point.  In

19   Mr. Merrill's brief, he brings up the counter-affidavit aspect

20   of the Texas statute that they're -- And if we were in state

21   court and we were under state procedures, there would be some

22   requirement to put a counter-affidavit perhaps in if we were

23   going to try to establish that it wasn't.  The case that they

24   cite clearly, you know, at the end of the opinion, talks about

25   the fact that while the affidavit itself may be a substantive

1    issue -- we recognize there's a split of opinion in Texas law

2    about that -- but the Court there goes on and says 'We're not

3    going to get to the procedural issue of requiring a counter-

4    affidavit to --

5         **THE COURT:** Right. Yeah, I'm not going to require

6    that. I don't think there's a need to add to any more paper

7    that we already have here.

8         **(Laughter)**

9         **THE COURT:** Okay. I think that'll take care of that

10   category then on the business record affidavits.

11        Now, the next category, category nine, is invoices

12   lacking business record affidavits, and this has to do with PX-

13   73-A, 75, 76-A, 78, 79-A, 80-A, 82, 86, 89, 91, 93-A, 96, 97,

14   98, 99, 101, 102, 103, 106, 107, 108-A, and 111-A, and then PX-

15   93. I gather these are certain pages out of that. Linden 297

16   through 336, PX-095, Magnum 13 through 19, PX-109, Trinity 108

17   through 115.

18        **MR. ALEXANDER:** Yes, your Honor. And to clarify the

19   page --

20        **THE COURT:** Right.

21        **MR. ALEXANDER:** The affidavits themselves list the

22   pages that are attached, and those are cases where those page

23   ranges were not included within the affidavit both the

24   reference (indiscernible).

25        **THE COURT:** All right.

1      **MR. MERRILL:** And your Honor, just to expedite this,

2  we will not offer these exhibits unless an independent

3  foundation is laid.

4      **THE COURT:** All right, very good. All right, that

5  takes care of category nine then. That will not be admitted

6  unless proper foundation is proven up.

7      All right, number ten, duplicate material. Surely

8  you've been able to reach some sort of accommodation on that

9  one, counsel?

10      **MR. ALEXANDER:** Your Honor, (indiscernible) we

11  haven't -- that's been low on the priority list so I don't

12  think we've --

13      **THE COURT:** I understand.

14      **MR. ALEXANDER:** -- talked about it yet. I'm sure we

15  can.

16      **MR. MERRILL:** My feeling, your Honor, is that to the

17  extent that we have exhibits that are included in another one,

18  we may have done that just for ease of handling so that we can

19  give the witness one page rather than a stack. Where there is

20  an absolute duplicate, I'm certainly willing to work with --

21  both of us want the best quality exhibit and we'll --

22      **THE COURT:** Right.

23      **MR. ALEXANDER:** Your Honor, that's absolutely right.

24  We would just kind of ask that because there are some

25  depositions that are going to be read for cross examination

1   purposes, if there's a duplicate that we use and one that was

2   marked in the deposition as opposed to the new PX document,

3   just so that the references with the witnesses will be

4   consistent.

5           THE COURT:  Right.

6           MR. ALEXANDER:  Now obviously if there's one that's a

7   better quality than the PX, we'll work with Mr. Merrill on

8   taking care of that issue.

9           THE COURT:  Right, right; that's fine.

10          All right, so the parties are going to work together

11  on number ten having to do with duplicate material.  I'm not

12  going to go through all those exhibit numbers.

13          Then we come to the demonstrative exhibits, PX demo

14  one and PX demo two.  Mr. Alexander?

15          MR. ALEXANDER:  My understanding is that the

16  plaintiffs have agreed that they'll lay a foundation before

17  admitting those.

18          THE COURT:  All right.  Mr. Nassif?

19          MR. NASSIF:  Apparently we did.

20      (Laughter)

21          THE COURT:  All right.  Well I assumed you would lay

22  a foundation.  Now, is there going to be an issue about whether

23  or not you're going to play this in opening or --

24          MR. NASSIF:  We're not planning to play it in

25  opening, Judge.

1    **THE COURT:**  Okay.

2    **MR. NASSIF:**  We will lay the foundation with the

3 witness and then we may --

4    **THE COURT:**  Very good.

5    **MR. NASSIF:**  -- play it while the witness is on the

6 stand so he can describe it after he lays the foundation, or we

7 may play it in closing argument.

8    **THE COURT:**  Very good, very good.  Okay, so that

9 takes care of category 11.

10    And then we're at category 12, and here these are

11 just various objectionable documents that have different types

12 of objections I suppose.  First of all, Exhibit Number 10, is

13 this a duplicate issue or --

14    **MR. ALEXANDER:**  Your Honor, Exhibit --

15    **THE COURT:**  You just want to go through those,

16 counsel, and state what the objection is?

17    **MR. ALEXANDER:**  My understanding is the plaintiffs

18 have agreed to lay a foundation on number 10.

19    **THE COURT:**  Is that correct, counsel?

20    **MR. NASSIF:**  I think that's right, yes.

21    **THE COURT:**  All right.

22    **MR. ALEXANDER:**  Let me look at number 50.

23    **MR. BROCK:**  I can handle 50, if I may, your Honor?

24    **THE COURT:**  Absolutely.

25    **MR. BROCK:**  Exhibit 50 is a construction schedule

1   that was prepared in December of 1978 for this particular

2   project, the CWA project.  It was prepared at a time when the

3   completion date for the project was different than what it

4   ultimately wound up to be when the contract was issued.  So the

5   plaintiffs want to bring it in; it shows completion of projects

6   scheduled from mid-August when in fact, when the project was

7   actually started, the completion date was the middle of

8   September as opposed to August.  So it's simply prejudicial;

9   it's not relevant because it was prepared at a point in time in

10  which the project had a totally complete -- a completely

11  different completion date.

12          There are supplemental schedules that were issued

13  which are in evidence.  At least two of them, one in April of

14  1979 and one in November of 1979, which they're more than

15  willing -- or certainly can question counsel about.  The one

16  witness that was questioned about it on our side said 'I've

17  never seen it before.  I don't know', and so certainly it's an

18  issue of relevance and the prejudice outweigh --

19          **MR. ALEXANDER:**  And I might just add to that, that in

20  December of 1978 when this was scheduled, the contract had not

21  even been let.  Chisholm Trail had not yet been awarded the

22  contract.

23          **THE COURT:**  All right.  Counsel?

24          **MR. NASSIF:**  Judge, I've asked one witness who did

25  put the schedules together; I asked him if he put this one

1   together and he said 'No'.  I would basically like to inquire

2   of one other witness as to whether or not he put this schedule

3   together.  I am not going to spend a lot of time on this

4   document but I think since they created the document, I at

5   least can, and I believe the document was part of a bid

6   proposal that was put together, and so I'm just going to

7   inquire into the document.  I'm not going to spend a lot of

8   time on it but I would like to find out -- And by the way,

9   Judge, the schedule changed to September 1st and then to

10  September 15th, and then to September 29th, so I'm just sort of

11  tracking the schedule through this, but I believe --

12          **THE COURT:**  Well, was this schedule actually ever in

13  place and then modified, or was it just initially proposed --

14  Are you saying it was proposed as part of the bid package?

15          **MR. NASSIF:**  Well the next schedule we have, Judge,

16  is March, after the project starts.  We don't have a schedule

17  between this December 1978 schedule and the March schedule, and

18  the contract was signed some time I believe, Judge, in January.

19  So what we have is a gap.  So what I'm assuming is that

20  schedule was in place until the modified it in March.

21          **THE COURT:**  Mr. Brock?

22          **MR. BROCK:**  Your Honor, there's no evidence at all

23  that it was in effect.  As Mr. Alexander says, it was actually

24  prepared before the contract was ever let.

25          **THE COURT:**  Was it part of a bid package or an RFP,

1    request for proposals, or --

2           **MR. BROCK:**  No (indiscernible) --

3           **MR. ALEXANDER:**  (indiscernible).

4           **MR. BROCK:**  -- lay a foundation with respect to where

5    it came from, Judge.

6           **MR. NASSIF:**  I can't lay the foundation if I can't

7    ask a witness, but -- and the one witness who put the schedules

8    together, Judge, he was not on the project until after the

9    contract was let.  So what I want to do is ask a witness who

10   was on the project before the contract was let if he prepared

11   the schedule.  If he says 'I didn't prepare it', I won't ask

12   again.

13          **MR. BROCK:**  It sounds like we had an agreement that

14   he'll lay a foundation before it comes in.

15          **THE COURT:**  I think that's right.  You can ask that

16   question to lay the foundation.

17          **MR. NASSIF:**  Thank you, Judge.

18          **THE COURT:**  And if it doesn't go any further, then it

19   doesn't come in.

20          **MR. NASSIF:**  Thank you, Judge.

21          **THE COURT:**  All right.  What about Exhibit 78 from

22   the defendants' CWA specifications?

23          **MR. ALEXANDER:**  Your Honor, this --

24          **THE COURT:**  Your --

25          **MR. ALEXANDER:**  I'm trying to figure out if I --

1          **THE COURT:**  -- brief says that they are relevant,

2    they bear a revision date of May 1999, well after construction

3    events at issue.

4          **MR. ALEXANDER:**  Yeah, that's right.  This is a

5    document prepared for CWA, 1999, you know, 20 years after the

6    building of the CWA line that they say dented their line, and

7    we just don't see its relevance.

8          **THE COURT:**  Okay.  Counsel?

9          **MR. NASSIF:**  Judge, the document really has I guess a

10   couple of relevant issues.  One is, it was prepared -- I agree

11   it was prepared in 1999, but the document was given to KBR and

12   KBR basically laid out the procedures that CWA should follow,

13   and it was part of a conglomeration between them.

14          The significance of it is, is to show that CWA's

15   going to testify that no one else dug in this area from 1979 --

16   that their records showed from 1979 until 2002 when we found

17   the leak.  So they kept track of it.  And this procedure is

18   part of their diligence in how they kept track of it.  No one

19   else dug in that area from at least 1999 to when we found the

20   leak in 2002.

21          All I'm trying to establish is that procedures were

22   in place, that they were monitoring any excavation in that

23   area, Judge, where our line was hit, and that if there had been

24   other excavation in that area, CWA would have known about it,

25   and so that's part of that process to eliminate other -- I

1    guess what I would say other possible impacts to our line.

2         **THE COURT:** Okay. I'll overrule the relevance

3    objection then to 78.

4         **(Plaintiff's Exhibit Number 78 was received in evidence)**

5         **THE COURT:** What about Exhibit 79?

6         **MR. BROCK:** Your Honor, my recollection is that this

7    is a straight relevance issue. It has to do with the

8    construction of an access road after all the repairs had been

9    made to the line and the excavation refilled. I don't see

10   where it's relevant to any issue.

11        **THE COURT:** January 2003 letter; is that right?

12        **MR. NASSIF:** Yes, Judge.

13        **THE COURT:** How is that relevant, counsel?

14        **MR. NASSIF:** There are actually two pieces of

15   information that make that relevant. One is there's a contact

16   there between Gary Phillips, who was the head of remediation

17   for a large portion of the Celanese network, not just here in

18   Houston, Texas, and there was contact between him and Mr.

19   Rundel. And Judge, I will lay the foundation on why this

20   document is important when I have Mr. Rundel on the stand.

21        **THE COURT:** Okay. All right, then if you lay the

22   foundation, then I'll rule at that time whether it'll come in.

23        All right, Exhibit 139.

24        **MR. ALEXANDER:** I understand they're going to lay the

25   foundation on 139, on 263, 277, and 291.

1          **THE COURT:**  Is that correct, counsel?

2          **MR. NASSIF:**  Oh, except for 263, objection.

3          **THE COURT:**  I'm sorry?  Is that correct with respect

4    to which numbers then?

5          **MR. NASSIF:**  One thirty-nine.

6          **THE COURT:**  One thirty-nine, 277?

7          **MR. NASSIF:**  Yes, Judge.  On 263, that's a report of

8    an investigation that was done on the pipe after it was removed

9    from the pipeline.  It's a report of an investigation, Judge,

10   and that investigation has been relied on by their expert, our

11   experts, and it is an investigation that Celanese conducted,

12   and we believe it's admissible on that basis, your Honor.

13         **THE COURT:**  All right.  Mr. Brock?

14         **MR. BROCK:**  Judge, the history is that the pipe was

15   removed from the ground, it was sent to a facility in Bishop,

16   Texas, a Celanese facility.  They then sent it to a third party

17   where tests were performed.  The issue -- And these are the

18   results of those tests.  The problem is, is that they're all

19   hearsay.  There's no foundation laid for this whatsoever by

20   anybody who has personal knowledge of the contents of these

21   documents.

22         Experts have relied upon this information, but that

23   does not make it admissible.  It simply means that it is

24   information which they can rely upon, but that doesn't make

25   hearsay admissible.  And these are clearly hearsay.

1          **THE COURT:**  But you don't object to the photos of the

2    pipe or the crack in question?

3          **MR. BROCK:**  That's correct, your Honor.

4          **THE COURT:**  All right.

5          **MR. NASSIF:**  Judge, we will have a witness who will

6    at least say that the pipe was delivered to so and so at

7    Celanese, and we may be able to lay a foundation that he then

8    sent it to this lab that did the work.  But we still believe

9    the document is admissible, Judge, on the basis I previously

10   stated.

11         **THE COURT:**  But you say that you can provide some

12   additional foundation for the document?

13         **MR. NASSIF:**  Yes, Judge, for the transportation --

14   Excuse me, Judge, for the transportation of the pipe.

15         **THE COURT:**  All right.

16         **MR. BROCK:**  I don't think that's the same thing as

17   laying a foundation for overcoming the objection in this

18   instance.  Simply the fact that it was transported to that

19   facility does not authenticate the tests that were performed

20   there at that facility.

21         **THE COURT:**  Okay.  Well, it can be referred to or

22   relied upon by an expert, and I guess during the course of

23   examination of that expert you can refer to that document,

24   right?

25         **MR. BROCK:**  Yes.  I agree, your Honor, it can be

1   referred to.  It's just that I don't think that it gets into

2   evidence on that basis as admitted.

3           **THE COURT:**  All right.  All right, at this point I'll

4   sustain the objection to the independent admissibility of this

5   Exhibit 263.  Of course, it is -- Again, you can ask questions

6   with regard to experts who may or may not have relied on it,

7   but only in that context.

8           All right, and then what about 277?  Again, Mr.

9   Nassif, you're going to make -- prove a foundation for this

10  before offering, is that right?

11          **MR. MERRILL:**  Yes, your Honor, on 277 and 291, we

12  would lay a foundation before making any use.

13          **THE COURT:**  All right.  And then that takes us to PX-

14  9, safety handbook from Celanese dated March 2002.  How is that

15  relevant, counsel?

16          **MR. MERRILL:**  Your Honor, the defendants have made

17  some arguments through their expert that Celanese has failed to

18  comply with the national contingency plan under CERCLA in

19  conducting the work at the site.  One element of consistency

20  with the NCP is compliance with the applicable OSHA

21  regulations.  I think their expert might have even referred to

22  that.

23          This particular document is the Celanese Clear Lake

24  plant safety manual which was applicable and used at the site.

25  So if the defendants are willing to stipulate that we complied

1   with the OSHA aspects of the national contingency plan, we can

2   withdraw this.  But that's the relevance of it.

3            THE COURT:  All right.  Counsel for defendants?

4            MR. DAVEY:  Your Honor, it's Bob Davey.  I'm here for

5   --

6            THE COURT:  Mr. Davey.

7            MR. DAVEY:  I don't think we're -- There are two

8   issues.  They've got a plant OSHA requirement and then they've

9   got a site issue that he's referring to, the CERCLA and the

10  compliance issues.  They're two different critters and two

11  different animals, and there's not a separate evaluation under

12  OSHA for purposes of CERCLA compliance, and so -- I mean,

13  that's our concern, if they're going to try and take the plant

14  and use it at this site that it's divorced by several miles

15  from it.

16           THE COURT:  Okay.  Well now, when was the leak

17  discovered?

18           MR. DAVEY:  March 2nd.

19           MR. MERRILL:  October 1st, 2002, your Honor.

20           MR. DAVEY:  October 1st, 2002.

21           THE COURT:  So this was in effect?

22           MR. MERRILL:  Yes, it was.

23           THE COURT:  This is dated March of 2002.

24           MR. MERRILL:  Yes, it was.

25           THE COURT:  And the safety handbook applies to the

1  plant?

2        **MR. MERRILL:**  It was written for the plant, but the

3  evidence will be that because this site was an emergency

4  response that they didn't have time to write a new plan, that

5  this was made applicable to the methanol site, which is a

6  couple of miles away from the plant.

7        **THE COURT:**  All right.  And there will be testimony

8  to that effect?

9        **MR. MERRILL:**  Yes.

10        **MR. DAWSON:**  If they lay a foundation for it, your

11  Honor, that's one thing, but --

12        **THE COURT:**  All right, All right.  I'll -- If the

13  plaintiffs can lay a foundation, then I'll allow this in, PX-

14  09.

15        All right, PX-26, the objection states 'This document

16  reflects at least one methanol transfer occurring after the

17  date the leak at issue was discovered and the pipeline

18  repaired.'  How is that relevant, counsel?

19        **MR. MERRILL:**  Your Honor, this is a memo in which Mr.

20  Sean Moore, an engineer who's previously been referred to, took

21  a look at the various transfer records, a sampling of them, to

22  see whether they tended to indicate a leak.  The document is a

23  business record in the sense that it's been stipulated to, and

24  they are objecting to, I guess, one particular entry, which is

25  after the leak was repaired.

1          Mr. Moore's point there was that he took samplings of

2    shipment records both before and one after the leak.  The one,

3    the pipe was repaired.

4          **MR. ALEXANDER:**  Your Honor, we withdraw our

5    objection.

6          **THE COURT:**  Okay.

7          **MR. MERRILL:**  Oh, okay.

8          **THE COURT:**  All right.  Thank you, counsel.

9          **MR. UNIDENTIFIED:**  Good job --

10         **THE COURT:**  All right, so PX-26 then will be

11   admitted.  That objection has been withdrawn.

12         **(Plaintiff's Exhibit Number PX-26 was received in**

13   **evidence)**

14         **THE COURT:**  PX-61, a 1996 document.  What is this

15   document about, counsel?

16         **MR. BROCK:**  Well, I think it's better for counsel to

17   tell you what it's about.

18         **THE COURT:**  All right.  Well tell me -- Yeah, maybe

19   since it's a plaintiffs' document, tell me what it is and why

20   it's relevant.

21         **MR. ALEXANDER:**  My understanding is they've agreed to

22   lay the foundation on this one actually, is what they've told

23   us.

24         **MR. UNIDENTIFIED:**  What?

25         **MR. ALEXANDER:**  Exhibit 61.

1          **MR. NASSIF:**  Judge, we're going to find it and tell

2    you what it's about.

3         **(Laughter)**

4              **THE COURT:**  All right.

5              **MR. BROCK:**  I can tell you what I think it's about,

6    Judge.

7         **(Laughter)**

8              **THE COURT:**  All right.

9              **MR. ALEXANDER:**  I think they've already agreed that

10   they'll lay the foundation.

11             **THE COURT:**  Let's see what they -- if they can find

12   out what it is and then whether or not they've agreed to lay

13   the foundation.

14        **(Attorneys confer with one another)**

15             **MR. ALEXANDER:**  Your Honor, can you clarify which one

16   you're looking at?

17             **THE COURT:**  PX-61.

18             **MR. UNIDENTIFIED:**  Right.

19             **MR. ALEXANDER:**  Okay.

20        **(Attorneys confer with one another)**

21             **MR. MERRILL:**  Your Honor, one of the things I did in

22   my brief is I said that we haven't spent the time to brief the

23   ones that only they use, and I think this is one of those.

24             **THE COURT:**  Okay.

25        **(Laughter)**

1          **MR. NASSIF:**  Judge, we will lay a foundation.

2       **(Laughter)**

3          **THE COURT:**  All right, lay the foundation for that

4   one.

5          All right, and then that takes us to category 13, and

6   again, this is a series of documents that the plaintiff has

7   agreed to, or lay the foundation before offering, and that's

8   Exhibits 74 -- And this may not be exclusive at this point, but

9   at the time this document was filed we're talking about

10  Exhibits 74, 282, 283, 284, 285, 286, 288, 289, 290, 326, 327,

11  328, 331, PX-11, 12, 18, 19, 20, 21, 36, 37, and 63.  And I

12  gather that is the agreement?

13         **MR. MERRILL:**  Yes, your Honor.

14         **THE COURT:**  All right.  This reminds me at some point

15  that initially when I was looking at these exhibits I was a

16  little bit puzzled by the duplication in the numbers.  And I

17  don't know if it's going to confuse the jury or not, but when

18  you've got exhibit numbers one through 200 and then PX numbers

19  one through 200.  I understand, I think, why the parties did

20  that, because as I understand it the ones with exhibit numbers

21  are just trial exhibits because they're documents that have

22  already been used and given numbers in depositions, is that

23  right??

24         **MR. BROCK:**  That's true with the numbers before 500,

25  your Honor.  The 500 series past, the defendants marked those

1   as our exhibits just to keep from having that confusion issue.

2   We wanted to have independent numbers, and --

3           **THE COURT:**  Thank you.

4           **MR. BROCK:**  -- and that's just how it worked out.

5           **THE COURT:**  I think that works a little better, but

6   at some point the jury might need to be explained so they're

7   not confused when they look for Exhibit 15 as to what's

8   Plaintiff's Exhibit 15 is not the same thing as Trial Exhibit

9   15.  But we can deal with that later.

10          All right, Exhibit 14; withdrawn exhibit subject to

11  cross or rebuttal.  And again, as I understand it, these deal

12  with exhibits that the plaintiff has agreed to withdraw and the

13  defendants are just covering themselves in case they intent to

14  be used for cross or rebuttal.  All right, that's Exhibits 97,

15  98, 99, 100, 211, 212, 215, 229, 232, 233, 236, 238, 260, 261,

16  266, 267, Plaintiff's Exhibit 45, 131, and 132.  So, the

17  defendants have reserved the right to seek a ruling on their

18  objections if these exhibits are used for cross examination or

19  rebuttal.

20          Then the final category for the defendant's is for

21  exhibits withdrawn, and these are Exhibits 125, 126, 127, 129,

22  130, 131, 201, 202, 203, 204, 205, 207, 208, 280, 281, 343,

23  Plaintiff's Exhibit 24, 25, 42, 43, 133.  And again, as I

24  understand it, the plaintiffs have indicated they'll withdraw

25  these exhibits and the defendants are simply reserving their

1   right to objection in the event plaintiffs change their mind.

2   Is that fair?

3           **MR. ALEXANDER:**  that's correct, your Honor.

4           **THE COURT:**  All right.  All right, and I believe that

5   takes care of defendants' objections to plaintiffs' exhibits at

6   this point, so we can now move to the other side of the street,

7   the plaintiffs' objections to defendants' exhibits.  And again,

8   I'll try to go through these as a group according to the

9   plaintiffs' brief on the subject.

10          The first topics that they listed are other Celanese

11  environmental issues or pipeline issues, and this relates to

12  Exhibits 105, 142, 298, 299, 540, 577.  I believe those are the

13  exhibits that are comprised here.  Mr. Nassif?

14          **MR. NASSIF:**  Judge, I believe I have those.

15      **(Attorneys confer with one another)**

16          **MR. NASSIF:**  Judge, do you have the exhibits in front

17  of you?

18          **THE COURT:**  Actually, I'm not sure I have those.

19          **MR. UNIDENTIFIED:**  They have the exhibits.

20          **MR. UNIDENTIFIED:**  Okay.

21          **THE COURT:**  The defendants have the exhibits, so they

22  can put them on the screen, but I don't think I was given a

23  copy of those on disk.

24      **(Attorneys confer with one another)**

25          **MR. NASSIF:**  Judge, I apologize, I was writing down

1    the numbers.  I didn't get all the numbers; can you give me the

2    numbers again?

3              THE COURT:  You want me to give you the numbers

4    again?

5              MR. NASSIF:  Yes, please.

6              THE COURT:  All right.  Exhibit 105.

7              MR. NASSIF:  Okay.

8              THE COURT:  142.

9              MR. NASSIF:  Okay.

10             THE COURT:  298, 299, 540, and 577.  And as I

11   understand it, these relate to exhibits concerning

12   environmental issues at the Celanese Clear Lake plant unrelated

13   to the methanol release site or concerning other Celanese

14   pipelines.

15             MR. NASSIF:  And Judge, I can address our objections.

16             THE COURT:  All right, go ahead.

17             MR. NASSIF:  If that's fine.  What these are, your

18   Honor, and these are plant site issues that have not nothing to

19   do with the methanol line.  Most of these issues have to do

20   with -- some I mean don't even have to do with outside the

21   plant, so they're nowhere even near, physically near, where the

22   methanol line is.  And I'll go through them as quickly as I

23   can.  For example --

24             THE COURT:  Well, okay.  I mean, I think we can talk

25   about this issue in a level of generality, can we not, I mean

1  as to --

2          **MR. NASSIF:**  That would be my thought.

3          **THE COURT:**  Right.

4          **MR. NASSIF:**  That was why I addressed it.

5          **THE COURT:**  Right.

6          **MR. NASSIF:**  If you want specifics, for example, just

7  to give you an idea, Exhibit 105 is an above-ground tank

8  closing for ethyl acetate.  It's not even a pipeline, or at

9  least it's not entirely a pipeline.

10          So what I did was -- And Exhibit 142 is a four-page

11 document talking about the plant wreckroff (phonetic) site from

12 the (indiscernible) (loud cough) program.  It doesn't have

13 anything to do specifically with any off-site pipelines.  So

14 these were some of the things that are certainly not

15 specifically with the methanol and the vinyl acetate line,

16 where they're located.  So these are some of the things I

17 pointed out when I went through these documents, which is the

18 basis for our objection.  I'll be glad to let them respond.

19          **THE COURT:**  Well, let me hear from defendants then.

20 Mr. Brock?

21          **MR. BROCK:**  Your Honor, these two particular

22 documents that he references, 105 and 142, do both have

23 sections which deal with releases of material outside the plant

24 boundaries in this pipeline corridor, which is where all the

25 Celanese pipelines are located.  The methanol runs right next

1  to these very lines where the incidents occurred.

2          In terms of the materiality of why it's relevant in

3  this particular instance, the Court sort of touched upon this

4  issue with regard to their motion in limine regarding cathodic

5  (phonetic) protection, and the Court will recall that in that

6  motion they had a footnote that they were not obligated -- I'm

7  sorry, the issue of cathodic protection was not relevant

8  because they were a statutorily innocent party under CERCLA;

9  that they had no reason to anticipate that an individual, a

10  company, would hit a pipeline and bury and cover it over.

11          These series of documents related to other releases

12  all go to the issue of notice on their part not only that they

13  had other pipelines that had been contacted by other apparently

14  contractors, according to them, which they did not investigate,

15  certainly gave them -- There are at least two instances where

16  that has occurred.

17          There are also instances where they had corrosion in

18  underground pipelines which again would give them notice that

19  there could be workmanship issues as well as problems with

20  their cathodic protection systems.

21          **THE COURT:**  Other pipelines where -- these same

22  pipelines are --

23          **MR. BROCK:**  The same corridor.

24          **THE COURT:**  -- are in the same corridor?

25          **MR. BROCK:**  Same corridors, running parallel to the

1   methanol line, subject to the same policies and procedures.

2   And if the Court likes, I can go through each one and show you

3   how it ties in to the facts particular to the methanol line

4   itself and the problems they've had with the methanol line.

5            **THE COURT:**  All right.  But you did say that with

6   respect to Exhibits 105 and 142, there are parts of those

7   exhibits that deal with the corridor and releases in the

8   corridor in pipelines?

9            **MR. BROCK:**  That's correct.

10           **THE COURT:**  But there are other parts that don't?

11           **MR. BROCK:**  That's correct.  And the concern is that

12  they just generally talk about other portions.  We'll be glad

13  to redact those.

14           **THE COURT:**  All right.

15           **MR. BROCK:**  They both reference releases in the

16  corridor.

17           **THE COURT:**  Mr. Nassif?

18           **MR. NASSIF:**  Judge, obviously, if they're putting in

19  something about all the plants' environmental procedures -- not

20  procedures but environmental compliance issues, those would be

21  very prejudicial to us, and there are very small portions on

22  some of these documents that you're talking about.  For

23  example, a document numbered 298, 299, which they want to get

24  in, it's a stress fracture on a line where a joint collapsed.

25  It's not even -- it's a 6-inch line; has nothing to do with

1    cathodic protection; it's basically a bad -- a bad weld job

2    that they do.

3          So I really question -- If you want to say to them,

4    'Okay, if it has something to do with the methanol or the vinyl

5    acetate lines', which were the two lines that went through

6    there, that's something I won't object to, but most of these

7    events that he's talking about had nothing to do even with the

8    area of the corridor where this spill or leak took place.

9          And some of these actually, for example, the one here

10   -- several of these documents have to do with what they call

11   'ditch A', which was an above-ground -- where the pipe came out

12   of the ground.  The methanol line didn't leak but another line

13   had been damaged above ground, and that line leaked and it

14   helped to corrode some portion of the methanol line.  I mean,

15   these are the kinds of things we're dealing with with these

16   documents.

17          **THE COURT:**  Yeah.

18          **MR. NASSIF:**  Your Honor.

19          **THE COURT:**  Mr. Nelson?

20          **MR. NELSON:**  If I could briefly?  You've already

21   ruled that we can't get into some of their, you know, problems

22   that they've had on other hits and other lines, and in the

23   spirit of goose/gander, I would say the same ought to be true

24   here.  It doesn't have anything to do with the line that's at

25   issue in this litigation --

1  **THE COURT:** Well, that's the question though. The

2 stuff clearly comes in if it has to do with these lines. Then

3 the question is: Well, if it's -- what about lines or any

4 releases within the corridor and this corridor that we're

5 talking about?

6  **MR. NELSON:** My suggestion, respectfully, is make

7 them lay a predicate, and if they can show that it, you know,

8 has some relevance to the issues in the case and they lay that

9 predicate, then so be it, but until they've laid that predicate

10 I think they ought not to be allowed to use them in the spirit

11 of the Court's other rulings.

12  **THE COURT:** Mr. Brock?

13  **MR. BROCK:** Judge, there's no comparison between

14 whether or not Eby hit a pipe in Colorado somewhere in this

15 scenario. This is a three-mile pipeline corridor; that's all

16 it is. They have eight pipelines; they all run parallel to one

17 another right in the same area. They're all subject to the

18 same policies and procedures with regard to inspections, with

19 regard to maintenance.

20  These facts, for instance, going back to the 1979

21 incident he talked about, that was in August of 1979. Not only

22 does it demonstrate that there were other contractors in the

23 corridor, which is an issue, in this particular instance they

24 actually had a fire where a contractor was digging and their

25 pipeline broke because of inadequate welds. It gives them

1   notice, first of all, that there can be workmanship issues, and

2   accordingly it's important for them to inspect their pipelines

3   and to maintain their pipelines.  Secondarily, it shows that

4   there were other contractors that were out in the corridors at

5   the very same time that we were, and so for that particular

6   one.

7           Likewise with respect to the ditch A, the methanol

8   and VA line run right next to the ethyl acrylate (phonetic)

9   line.  They had corrosion there -- First of all, they had

10  corrosion in the methanol line in 1992 at that same location,

11  which they fixed; should have given warning that they needed to

12  inspect.  Seven years later the ethyl acrylate line right next

13  to it starts leaking; goes to the adequacy of their inspection

14  programs.

15          **THE COURT:**  All right.  Well, it seems to me, and I

16  am mindful of the goose/gander issue here, but it does seem to

17  me that to the extent these documents relate to release issues

18  pertaining to either these pipelines or anything within this

19  corridor, then it comes in.  Anything having to do with

20  environmental problems or releases outside the corridor or

21  other types of compliance issues or spills not related to this

22  corridor needs to be redacted.  And so the objection --

23          **MR. ALEXANDER:**  We're not trying to offer anything

24  about releases that they had at some plant off in Dallas or St.

25  Louis or whatever.

1          **THE COURT:** Mr. Dawson?

2          **MR. DAWSON:** Can I just suggest you let them redact

3    what they intend to redact and present it back to us before

4    they use it so we have a chance to look at it? Here's what --

5          **THE COURT:** Yeah, that's fair.

6          **MR. UNIDENTIFIED:** Sure.

7          **THE COURT:** That's fair.

8          **MR. UNIDENTIFIED:** Sure.

9          **THE COURT:** And then if you need to revisit that,

10   then we can come back and talk about it.

11         All right, so those exhibits then will be admitted

12   subject to being redacted along the lines that I've just

13   indicated here having to do with the corridor at issue.

14   **(Plaintiff's Exhibit Numbers 105 and 142 were received in**

15   **evidence)**

16         **THE COURT:** All right then, the next category of

17   documents plaintiffs object to, hazardous pipeline issues at

18   other Celanese pipelines. This is Exhibit 44 and -- excuse me,

19   Exhibits 144 and 145. It seems to me you've got a relevance

20   issue if they're related to other pipelines unless they're

21   somehow within this corridor.

22         **MR. BROCK:** Your Honor, first of all, Exhibit 144 --

23   Let me back up. Their argument is that it's violative of the

24   motion in limine, it has to do with hazardous pipelines; this

25   has nothing to do with the motion in limine or a

1   characterization of these pipelines as hazardous by DOT or TRRC

2   or anyone else.  Exhibit 144 is a 1991 maintenance manual for

3   the maintenance and inspection of pipelines.  The title of it

4   says 'Maintenance for the hazardous pipelines.'  At that time

5   they treated all their pipelines as hazardous.

6           There's deposition testimony by Mr. Stwash (phonetic)

7   that says this was applicable to these pipelines during this

8   period of time.  In fact, one of the exhibits that they

9   objected to that the Court just ruled upon, I think it's 539,

10  has to do with the repair of the methanol line.  Let me see if

11  I can find that real quickly.  It has to do with a repair of

12  the methanol line in 1992, and it says, 'The procedures in this

13  manual, Exhibit 144, will be followed.'  And so clearly this

14  manual, based upon the testimony, applies clearly to the

15  methanol line as well as to the remainder of the lines in the

16  corridor.

17          **THE COURT:**  All right.  Plaintiffs?

18          **MR. NASSIF:**  Judge, Exhibit 539 has to do with the

19  acetic acid line.  Maybe Mr. Brock has a different -- it

20  doesn't have to do with the methanol line.  But you know what,

21  Judge?  We'll withdraw our objection to 144, but we maintain

22  our objection to 145 because that is a TRRC citation.  There's

23  no resolution of it, there's no document; it subsequently --

24  And Judge, I don't even think that citation relates to the

25  methanol line because I'm not -- it says line 121, and I don't

1  know that that is the methanol line, and so my argument there,

2  Judge, is we ultimately know that this citation, there's no

3  penalty, no punishment, no evidence of anything, but we

4  ultimately know that the methanol line was declared to be a

5  non-hazardous line.  So I think that citation ought to be --

6          **THE COURT:**  Mr. Brock?

7          **MR. NASSIF:**  -- eliminated.

8          **MR. BROCK:**  It is a citation by the TRRC to Celanese

9  for improper keeping of records related to line 121.  Line 121

10 runs to the same corridors, it's subject to this same Exhibit

11 1445, the maintenance and inspection pipelines, and --

12         **THE COURT:**  Well, was there -- Excuse me, was there

13 any resolution of the citation?

14         **MR. BROCK:**  Judge, it's not clear from the records.

15 It is a citation, it puts them on notice of the need to

16 maintain records with regard to not only this line but all the

17 pipelines that are subject to the same procedure, which we

18 think we'll be able to show that they did not do subsequent to

19 that.  And again, it still goes to this issue of whether or not

20 there was some foresee-ability to some statutory innocent

21 party.

22         **THE COURT:**  Well, at this stage it's just an

23 accusation, and unless I can see proof that, you know, the

24 citation was in fact imposed, then I'm not going to allow that

25 in.  So I'll sustain the objection to 145 at this point.

1          All right, methanol line issues related to the

2     release.  There's a relevance objection to Exhibits 151, 511,

3     539, and 235.  Now, for the -- Mr. Brock?  Or let me hear from

4     the plaintiff now.

5          **MR. BROCK:**  Sure.

6          **THE COURT:**  Now, these are -- these are issues

7     related to this pipeline, you're just saying, that are not

8     related to the release, is that correct?

9          **MR. NASSIF:**  Yes, your Honor.  And I think you've

10    probably already made a decision on some of these, but let me

11    address one issue, Judge.  Because I think what you're asking

12    them to do is to make sure this information relates to

13    something inside the corridor, as I understand --

14         **THE COURT:**  Right.

15         **MR. NASSIF:**  -- the Court's ruling.  And we'll deal

16    with that as your prior ruling.

17         Exhibit 235 is a CP, is a cathodic protection

18    inspection for a system that's inside the plant only.  And

19    because of that, Judge, it has no relevance either to the

20    corridor as a separate cathodic protection system or the

21    methanol lines outside the plant.  And so this document has no

22    relevance to anything having to do with the cathodic protection

23    system for the methanol and Astec (phonetic) line that

24    they're...

25         **THE COURT:**  Mr. Brock?

1          **MR. BROCK:**  Respectfully, Judge, it's not inside the

2     plant; it's inside the terminal facility to which the pipeline

3     from the plant that goes through these corridors connects into

4     the terminal facility.  Any time they make a shipment it starts

5     at the plant; it ends at the terminal facility and goes through

6     the corridors.  The significance of it, those pipes were built

7     at the same time as these pipes that the methanol line was at.

8     It relates to methanol.  They had a leak in the facility.  They

9     determined it was a cathodic protection issue due to some

10    problems that they had with the system.

11         Also, in there they indicate that as a result of this

12    they've determined that they have not been checking the

13    cathodic protection system within the pipeline corridors and

14    that they're going to make changes from that point.  And so --

15         **THE COURT:**  All right.  I've heard enough, Mr. Brock.

16    I think there's sufficient relevance here.  You can argue about

17    the weight.  But I'll overrule the objections to Exhibits 51

18    [sic], 511 and 539 and 235.

19         All right.  The next category is foundation problems

20    on draft documents.  And this you're going to have to explain

21    this a little bit to me having to do with the Arcadis and

22    native format documents.

23         **MR. UNIDENTIFIED:**  Your Honor?

24         **THE COURT:**  Yes, sir.

25         **MR. UNIDENTIFIED:**  May I proceed just one second?

1  Just so the record's clear, I think you said 151 [sic] and it's

2  151 I believe.

3          **MR. UNIDENTIFIED:**  You said 51 and --

4          **THE COURT:**  I'm sorry.  I said 51 instead of 151?

5  Thank you.  I'm glad you clarified.  All right.  All right,

6  Mr. Merrill.

7          **MR. MERRILL:**  Your Honor, I may have made this more

8  complicated than it needs to be.  Because of electronic

9  production done by Arcadis, one of the environmental consulting

10  firms, we've got electronic versions of their documents and

11  paper versions of their documents; and sometimes they appear to

12  be the same.

13          The nature of my objection really here is I've

14  objected to these documents on the basis of hearsay in a later

15  category.  But I have another level of objection here is that

16  some of these documents appear on their face to be draft

17  documents.  Whether they're in paper or electronic they appear

18  to be drafts.  And it's an additional foundational objection in

19  addition to the hearsay objection.

20          **THE COURT:**  So the focus is, is that these are really

21  drafts.

22          **MR. MERRILL:**  Or we can't tell whether they're final.

23          **THE COURT:**  Or you can't tell.

24          **MR. MERRILL:**  They have features which make them

25  appear to be drafts.

1          **THE COURT:**  Yeah.  Counsel?

2          **MR. UNIDENTIFIED:**  Your Honor, I think the documents

3    that we're talking about are being prepared by a firm called

4    Arcadis.

5          **THE COURT:**  Right.

6          **MR. UNIDENTIFIED:**  Which was hired as a consultant to

7    Celanese.  And there are quite a number of these documents

8    where it appears that they're making some adjustments to the

9    survey lines that were done electronically.  I think the fact

10   that whether they're a draft or not doesn't go to foundational

11   issues, in our opinion.  They're the records of Arcadis.  It

12   was a consultant of Celanese.

13         You know, I think that we are going to be able to

14   show to the jury that Celanese was actually -- or Celanese as a

15   consultant I should say -- were taking these electronic lines

16   and moving them slightly to associate the leak with our lines

17   is going to be our proposition.  So I think that these come in

18   to show, you know, that we -- the theory that we have behind

19   why these lines were changing.  And I think they're saying the

20   lines being changing as a draft issue, I think we are using

21   them for a completely different purpose.

22         **THE COURT:**  Well, but the problem is that there's not

23   a foundation for some of these drafts or documents.

24         **MR. UNIDENTIFIED:**  Well, your Honor --

25         **MR. ALEXANDER:**  Go ahead.

1          **MR. UNIDENTIFIED:**  No, no.

2          **MR. ALEXANDER:**  Just because they're draft doesn't

3    mean they're not a business record.

4          **THE COURT:**  Right.

5          **MR. ALEXANDER:**  I mean they were prepared by the same

6    people under the same circumstances.  The fact that they

7    changed their mind or didn't change their mind is irrelevant.

8    It's still a business record.

9          **MR. MERRILL:**  I would certainly disagree with that.

10   If you look at the elements of Rule 8036, it has to be prepared

11   in the ordinary course of business by a person having knowledge

12   of the facts or obtained knowledge of the facts, who is then

13   creating a record at that point in time.  If a person makes a

14   draft that's not their finished product and is subject to

15   checking, correction, et cetera, it doesn't appear to me that

16   that's a business record.  It doesn't have those -- 8036 if you

17   get down -- there's a line that says something about the

18   reliability of the document and whether there's something about

19   the document that raises questions as to reliability.  And if

20   it's a draft, to me that raises a question about its

21   reliability.

22         **THE COURT:**  Counsel?

23         **MR. DAVEE:**  Your Honor, just there are two issues

24   here.  There's the foundational one and now we off on the

25   hearsay one.  The truth of the matter is it's not a business

1    record.  801(2)(D)(2)[sic] it's not hearsay.  This is from

2    their agent.  These are the people they hired from the get-go.

3    They got them out there within days of this going on.  They

4    hired them to go give them an analysis, do surveys, figure out

5    how much plume we've got, give us the reports back.  If you

6    read the comments, this is exactly the kind of material from an

7    agent within the scope of their authority that's producing this

8    that is not hearsay.

9              **THE COURT:**  Mr. Dawson?

10              **MR. DAWSON:**  A few minutes ago they argued that the

11   report from the people that examined the pipe, you know, that

12   we hadn't laid a foundation and that is hearsay, it can't come

13   in.  They don't -- you know, the fact that's it some company

14   that we hired doesn't make it an admission of a party opponent.

15   They have to prove a business record or overcome the hearsay

16   objection, and they haven't.

17              **THE COURT:**  Well, but these were documents that were

18   produced, were prepared and produced by your agent, correct?

19              **MR. DAVEE:**  In the scope and course of their

20   authority that goes to this very issue.

21              **MR. DAWSON:**  It's no different than the documents

22   that were produced by the company that examined the pipe and

23   did the testing on the pipe.  It's no different.

24              **MR. MERRILL:**  Your Honor?

25              **THE COURT:**  Yes, sir?

1          **MR. MERRILL:**  The comment I was going to make is that

2    we have to remember the difference between the drafts.

3    Celanese didn't hire consultants to, you know, give us drafts

4    that we're going to rely on.  We hired them to produce final

5    product.  You know, I fail to see what the relevance is of

6    somebody's intermediate document that's before their final

7    deliverable to our client.

8          Now, I'm amazed that this comment that there was some

9    type of wrongdoing going on at Arcadis and they were trying to

10   jiggle their -- I have never heard anything about that.

11   There's no testimony that I'm aware of that leads to anything

12   about that that I've heard any discovery in this case.  And

13   that's the only possible relevance I can see to this.

14         **MR. DAVEE:**  Well, your Honor, relevance is one thing.

15   But 801(d)(2)(D) can't be clearer.  It defines, excludes from

16   hearsay statements which are not hearsay; a statement is not

17   hearsay if the statement is offered against a party and is --

18   and then you go to (d) -- a statement by the parties' agent or

19   servant concerning a matter within the scope of the agency or

20   employment made during the existence of the relationship.

21         And that's clearly what this is.  If you'll read the

22   comments to the rule, this is exactly the situation that is

23   designed to get around.  They hired Arcadis, they gave them the

24   scope of work to do this stuff.  This is not hearsay.

25         **THE COURT:**  All right.  At this point I'm going to

1  overrule the objection.  But I will not be -- I will be open to

2  reconsidering that once we go to trial.  All right.

3         **MR. NASSIF:**  Your Honor?

4         **THE COURT:**  Yes, sir.

5         **MR. NASSIF:**  Pardon me.  When we did these objections

6  sort of by groups there was one objection I didn't raise to

7  Exhibit 151.  And that's a general maintenance document.  That

8  was the document, your Honor, where you started to refer to it

9  as Exhibit 51 and then it was corrected.

10        **THE COURT:**  Okay.

11        **MR. NASSIF:**  It's a general maintenance document,

12  which has a date of December the 10th, 2003.  It doesn't have

13  anything to do with the corridor.  I don't believe it even

14  talks about the methanol line.  And it would be post-dated in

15  terms of when the spill was detected in 2002.

16        **THE COURT:**  So you're going back to -- this is

17  Exhibit 151?

18        **MR. NASSIF:**  151.  I don't think it has any

19  relevance.  It post-dates the spill detection of the release in

20  2002.

21        **THE COURT:**  Mr. Brock?

22        **MR. BROCK:**  Judge, it's the printout of a database of

23  the incident.  It specifically references a 2000 incident with

24  a methanol line.  In fact, it refers to this area that we were

25  talking about earlier.  It does have other entries on it.  We

1    will redact those other entries except those related

2    specifically to this --

3         THE COURT:  All right.  I think that will take care

4    of that problem the, counsel.

5         MR. UNIDENTIFIED:  Thank you.

6         MR. NASSIF:  Thank you, your Honor.

7         THE COURT:  All right.  Then, the next category that

8    I have is objections to some documents that have handwritten

9    hearsay on them, Exhibits 140 and 162.  I mean it does seem to

10   me that a document that does have handwriting on it --

11        MR. UNIDENTIFIED:  Your Honor, we withdrew those two

12   documents.

13        THE COURT:  All right.  That needs to be cleaned up.

14   All right.  So Exhibits -- now, you're withdrawing the exhibits

15   or you're going to clean it up to eliminate the handwriting?

16        MR. UNIDENTIFIED:  Your Honor, we withdraw the

17   exhibits.

18        THE COURT:  Okay.  All right.  So Exhibits 140 and

19   162 are withdrawn.

20        All right.  Then the next category, expert work

21   product, Exhibits 247 and 248 and 234 and 575.

22        MR. UNIDENTIFIED:  Your Honor, 234, 247, 248 and 575

23   we will agree to lay a foundation.

24        THE COURT:  All right.  All right.  Then those

25   objections are -- well, the Defendants have agreed to lay a

1   foundation before tendering those exhibits for admission.  All

2   right.

3           Next category, hearsay objection of third-party

4   business records.  Exhibits include 43, 45, 184, 188, 257, 305,

5   505, 549, 554, 557 and 576.

6           **MR. UNIDENTIFIED:**  Your Honor, I think we have an

7   agreement with the other side that they are withdrawing their

8   objections to 43 and 45.  We are --

9           **MR. UNIDENTIFIED:**  Correct.

10          **MR. NASSIF:**  That's correct, your Honor.

11          **THE COURT:**  That's correct?  All right.

12          **MR. UNIDENTIFIED:**  We are withdrawing Exhibit 184

13  from our exhibit list.

14          **THE COURT:**  Okay.

15          **MR. UNIDENTIFIED:**  And we are withdrawing Exhibits

16  505, 549 and 576.

17          **THE COURT:**  All right.  And so the Plaintiffs are

18  withdrawing their objections to Exhibits 43 and 45 and the

19  Defendants are withdrawing Exhibits 184, 505, 549 and 576.  And

20  so that leaves us with Exhibits 188, 257, 305 and 554 and 557

21  in dispute.

22          **MR. DAVEE:**  Your Honor, if I could.  On 188 -- excuse

23  me -- yes, 188, as I understand there's a hearsay objection.

24  188 is a email string which begins between two Celanese people

25  talking to each other about the nature of the hole, the size of

1   the pressure, how much can leak out at a given time.  And then

2   it starts leaping over into Arcadis where they're communicating

3   with each other discussing the nature of the leak.

4           And it raises two issues:  a notice issue in terms of

5   their problem and their need to go back and review the records

6   to determine exactly the nature and extent of the release.

7   And, obviously, I don't see how it can be hearsay if it starts

8   off between their Celanese people and it's communications

9   between their agents, who are analyzing the nature of the plume

10  and how much release they have.

11          **THE COURT:**  Mr. Merrill?

12          **MR. MERRILL:**  Your Honor, maybe this could be solved

13  by redaction.  It does start off with a document that is a

14  Celanese email.  But then it turns to an email string among

15  people at Arcadis with Celanese not being included in the

16  emails going back and forth.  And at that point it turns into

17  an Arcadis -- and there's no tie-in back to Celanese on the

18  face of the document.  So in my view of it the portions of it

19  that are colloquy among the Arcadis people, that's a third-

20  party document that was subject to the hearsay objection.

21          **THE COURT:**  Counsel, can you work with redaction?

22          **MR. DAVEE:**  It's not hearsay.  It's 801(d)(2)(D).

23  This is not hearsay.  They charge these people.  They're giving

24  them the information they need to figure out how much of a

25  plume they got, how much methanol released, and that's what

1    they're hired to do.  It's clearly within the scope of their

2    authority; it's not hearsay.  And they're discussing what they

3    need to do and what they need to get back to Celanese on.

4         **MR. MERRILL:**  But there's no communication -- there's

5    no indication that it was communicated back to Celanese.  This

6    internal work product of a consulting firm that we hire is

7    hearsay unless --

8         **THE COURT:**  Well, now these emails that pertain to

9    Arcadis they're back and forth between Arcadis personnel?

10        **MR. MERRILL:**  Right.

11        **THE COURT:**  But they were transferred, transmitted to

12   Celanese, right?

13        **MR. MERRILL:**  No.

14        **THE COURT:**  Well.

15        **MR. UNIDENTIFIED:**  Your Honor --

16        **MR. MERRILL:**  There's no evidence of that.  The email

17   trail starts out with -- I believe it's Sean Moore (phonetic).

18   And then that ends up in Arcadis's hands, and then there's

19   colloquy in those emails among the Arcadis people.  Unless I'm

20   wrong.  I don't have this in front of me, but that's my

21   recollection of the documents that there's no --

22        **MR. DAVEE:**  Well, I mean I can show you my -- but,

23   your Honor, what it is it starts out where they're giving flow

24   analysis and they're making assumptions and they're discussing

25   the flow analysis.  They're giving that to Arcadis.  Arcadis is

1    discussing what that means in terms of the methanol plume.  The

2    big issue is it doesn't make any difference.  It's their agent.

3    That's what they're charged with responsibility for doing,

4    determining this.  It's not hearsay.

5            **MR. MERRILL:**  This is an environmental consulting

6    firm we asked to perform certain functions.  We're not barred

7    by, you know, their internal discussions.

8            **THE COURT:**  Right.

9            **MR. MERRILL:**  You know, if a report comes back from

10   Arcadis to us, that may be something that provides notice to

11   Celanese.

12           **THE COURT:**  All right.  Well, I'll overrule the

13   objection to 188.

14           What about 257?

15           **MR. DAVEE:**  Your Honor, 257 and two -- excuse me --

16   554 -- 257 and 557 it's the same issue.  This is Earthtek.

17   There are other consultants that they contacted and brought in

18   to review the Arcadis recommendations and make recommendations

19   on how to proceed.  There are pilot studies, work plans for

20   pilot studies on methods where they're telling them:  Here's

21   the method you should adopt for addressing this issue; so (a)

22   it's evidence of notice and what knowledge that Celanese has in

23   terms of the way to proceed with regard to addressing the

24   release and the remediation; and number two, it's their agents

25   as well giving them the advice they're paid for in accordance

1   with their agents and within the scope of it.  So it's not

2   hearsay on that basis either.

3          **THE COURT:**  Okay.

4          **MR. DAVEE:**  Just like Arcadis.

5          **THE COURT:**  Mr. Merrill?

6          **MR. MERRILL:**  Your Honor, Earthtek was an

7   environmental consulting firm that was brought in to provide

8   alternative proposals to Celanese as to how to approach this

9   job.  And eventually their work plans were not accepted, the

10  proposals were not accepted, and Celanese did not go forward.

11         Although there's an argument made that these are

12  offered for notice to Celanese, in fact, the reason the

13  Defendants wants to introduce these documents is because their

14  expert, Ms. Leiland (phonetic), is arguing that had Celanese

15  used a different remediation methodology it would have cost

16  less money.

17         And there are projections of cost in these proposals.

18  And they clearly want to offer these to say:  Look, if they'd

19  gone with Earthtek they would have saved a lot of money.

20  They're offering it for the truth.  It's not seriously disputed

21  that there are many different alternative ways of approaching

22  an environmental remediation.  The fact that somebody made a

23  pitch to us to do one of these doesn't really put us on notice

24  of anything that's relevant to the issues of whether we

25  complied with the TRRP or the national contingency plan

1    (phonetic).

2            **THE COURT:**  All right.  All right.  Now, I'll

3    overrule the objections to 257.

4            What was the other one, 557?

5            **MR. DAVEE:**  257, 554 and 557.

6            **THE COURT:**  Okay.  257, 554 and 557, those are all

7    related documents.  So I'll overrule the objections to those.

8            **MR. DAVEE:**  Your Honor, I may not have said -- it's

9    257, 554 and 557.  I apologize.

10           **THE COURT:**  Okay.  All right.  257, 554 and 557 the

11   objection is overruled.

12           And that leaves us with 305; is that right?

13           **MR. BROCK:**  Yes, your Honor.  305 is a listing of

14   coordinates from a surveyor that Celanese retained to come out

15   and survey the site.  They measured the excavation, the outside

16   limits of the excavation, all of the borings, all of the

17   monitoring wells that were drilled.  They measured the

18   elevation of the natural ground.  Those are all issues which

19   are going to be important for this jury's consideration.

20           Exhibit 577 is a deposition on written questions of

21   this same individual.  It's Thompson Surveying.  And we've

22   offered the entire deposition on written questions with all the

23   exhibits.  These are the coordinates out of that exhibit, as

24   well.  Admittedly, there is duplication but it's much easier

25   for us to be able to locate and present to the witness in this

1   format.

2           **THE COURT:**  Plaintiffs?  So this is really,

3   basically, a duplication type issue, right?

4           **MR. NASSIF:**  Well, I think what it is --

5           **THE COURT:**  And if it's coming in under the other --

6           **MR. NASSIF:**  It's not really the -- as I understand

7   it, Judge, it's not really the witnesses' exhibit.  It's an

8   extrapolation that I think we've made.  Is that correct,

9   counsel?

10          **MR. BROCK:**  No.  No, it's not.  It's correct, Judge.

11  It's their exhibit, which is proven up by a deposition on

12  written questions.

13          **MR. NASSIF:**  Oh, what you've done though is you've

14  pulled information out of that exhibit.

15          **MR. BROCK:**  There were pages out of that exhibit.

16  They're duplicates to what's in that exhibit.  We just pulled

17  them out for simplicity sake and being able to get a small

18  exhibit readily located to the witness.

19          **MR. NASSIF:**  I mean I think they ought to have to lay

20  a foundation.  They did come out of this exhibit, before they

21  can enter --

22          **THE COURT:**  Well, can't you take a look and tell me

23  whether or not that foundation has been laid?  I mean either it

24  is part of the other exhibit or it's not; is it not?

25          **MR. UNIDENTIFIED:**  We'll check it.  We'll check it.

1          **MR. NASSIF:**  We'll check it, Judge, and we'll get

2    back --

3          **THE COURT:**  Okay.

4          **MR. UNIDENTIFIED:**  I can show you the page numbers on

5    the --

6          **MR. BROCK:**  Well, we need to check it.

7          **MR. UNIDENTIFIED:**  Sure.

8          **THE COURT:**  All right.  Presuming that it is, you

9    know, already part of another exhibit, I'm not going to -- I'll

10   deny -- or overrule that objection to 305.

11         All right.  Then that takes us down then to various

12   miscellaneous exhibits.  Counsel for the Plaintiff, do you want

13   to go through these one by one?  And we're just about done I

14   think once we get through with this category.

15         Mr. Merrill or Mr. Nassif?

16         **MR. UNIDENTIFIED:**  Oh, these are mine.

17         **THE COURT:**  I mean I'm on Page 20 of your memo and

18   your --

19         **MR. NASSIF:**  Well the --

20         **THE COURT:**  Exhibit 27 is the 1979 letter pertaining

21   to cathodic protection of the CWA line?

22         **MR. NASSIF:**  Yes.  And I don't quite understand what

23   the relevance would be of whether or not there was cathodic

24   protection on the CWA line.  It's not the methanol line.  It's

25   our line that has to do with the line they installed.  That's

1  the issue there, Judge.

2          **THE COURT:**  Mr. Alexander?

3          **MR. ALEXANDER:**  Your Honor, one of the things that's

4  important in this case is their basic theory is that, you know,

5  we hit the pipeline and nobody had the opportunity to know

6  this.  Well, there were a lot of people that had the

7  opportunity to know this.  One of them was Exxon.  Exxon was

8  involved every step of the way involving this, with the

9  inspection, with making comments on drawings, with a whole

10  variety of things.

11          This is one example of the way in which Exxon was

12  directly involved in the CWA project out there examining things

13  that were going on, making comments on the engineering.  And

14  it's relevant for that purpose.

15          **THE COURT:**  So it's a letter from Exxon?

16          **MR. ALEXANDER:**  It's a letter from Exxon to Brown &

17  Root commenting on the construction drawings and specifications

18  for the CWA 30-inch water line.

19          **THE COURT:**  That doesn't strike me as particularly

20  relevant to the issues here when we're really focused on the

21  methanol line as far as cathodic protection.  So I'll sustain

22  the objection to Exhibit 27.

23          What about Exhibits 43 and 45?

24          **MR. ALEXANDER:**  Forty-three and 45 their objections

25  have been withdrawn it's my understanding.

1          **MR. NASSIF:**  Yes.  And we've withdrawn --

2          **MR. ALEXANDER:**  The same is true for --

3          **MR. NASSIF:**  -- objections to 59 and 77.

4          **MR. ALEXANDER:**  -- 59 and 77.

5          **MR. UNIDENTIFIED:**  For 59 and 77.

6          **THE COURT:**  All right.  So Exhibits -- the objections

7    to Exhibits 43 and 45, 59 and 77 have been withdrawn by the

8    Plaintiffs; is that correct?

9          **MR. NASSIF:**  Yes, your Honor.

10         **THE COURT:**  All right.  Then, the next one I have is

11   Exhibit 149.

12         **MR. NASSIF:**  The reason we objected to this document,

13   your Honor, is this has to do with air emissions inside the

14   Celanese plant, although it does have to do with the methanol

15   lines.  It does have to do with piping inside the plant from

16   the methanol line, and that's why we objected to it.

17         **MR. ALEXANDER:**  Your Honor, Mr. Nassif is not quite

18   correct.  It does specifically deal with the methanol line as

19   he admits, and it talks about how the methanol line -- one of

20   the reasons the methanol line they're treating it in the way

21   that it does is because it involves piping beyond the plant

22   boundaries that are over or adjacent to the waterways or public

23   throughways, which is exactly what the methanol line in the

24   corridor was doing.  It directly relates to the methanol line

25   in the corridor.

1          **THE COURT:**  Mr. Nassif?

2          **MR. NASSIF:**  It makes reference to where the methanol

3     line goes, Judge; but it has to do with operations inside the

4     Celanese plant, not in the corridor.

5          **THE COURT:**  All right.  I'll overrule the objection

6     to Exhibit 149.

7          Then the next one, Exhibit 219, 1973 correspondence

8     from Exxon -- I don't think it was Exxon Mobil back then.

9          **(Laughter)**

10         **MR. UNIDENTIFIED:**  You're right.

11         **THE COURT:**  Involving --

12         **MR. ALEXANDER:**  Exxon Pipeline Company, which was the

13    entity that supervised all of the work in the corridors and set

14    out the requirements for piping in the corridors, both CWA's

15    and Celanese's.  And this was a letter in '73 spelling out

16    Exxon's requirements for Celanese for its lines in the

17    corridor.

18         **MR. NASSIF:**  It's a 1973 document, Judge.  And I

19    would note --

20         **THE COURT:**  But it pertained to the methanol

21    pipeline, right?

22         **MR. NASSIF:**  It does, Judge.

23         **THE COURT:**  All right.  I'll overrule the objection

24    to Exhibit 219.

25         Exhibit 227, ASME pressure piping standard.

1          **MR. BROCK:**  We withdraw that one, Judge.

2          **THE COURT:**  All right.  The exhibit has been

3     withdrawn by the Defendants.  Okay.

4          Then Exhibit 500, OSHA Process Safety Management

5     Compliance Manual.

6          **MR. BROCK:**  Judge, this is an internal publication of

7     Celanese with regards to how they're required to treat their

8     hazardous materials with methanol being a hazardous material.

9     The significance of this particular document really is

10    localized upon one section that has to do with investigations,

11    and that is if you have a release or an incident involving a

12    hazardous material under OSHA process safety management, you're

13    obligated to conduct an investigation with certain criteria,

14    including root cause analysis.

15         There is testimony that Celanese followed these

16    procedures for years even before its implementation and

17    testimony that once it was implemented in the mid 90s they were

18    obligated to follow it.  They did not follow it with respect to

19    this particular incident, and we think that that's telling as

20    far as --

21         **THE COURT:**  Now, this document who authored this

22    document?

23         **MR. BROCK:**  Celanese.

24         **THE COURT:**  Celanese?

25         **MR. BROCK:**  It's an internal publication of Celanese.

1  Yes, sir.

2          THE COURT:  Okay.  And that's the title of it, OSHA

3  Process Safety Management Compliance Manual?

4          MR. BROCK:  Yes, sir.

5          THE COURT:  All right.

6          MR. NASSIF:  Judge, this document, obviously, is an

7  OSHA document and has to do with in-plant operations.  There's

8  no testimony that this document in itself would have applied to

9  an offsite release of material.  And so that was our objection

10 on this document.  It really doesn't -- it's inapplicable for

11 an offsite release.  This has to do with an in-plant release of

12 material.  And that's where the safety requirements come up for

13 OSHA.  Occupational Safety and Health do not have requirements

14 for releases that happened outside the plant.

15         THE COURT:  Mr. Brock?

16         MR. BROCK:  Respectfully, I disagree.  Process safety

17 management under Section 119 of the OSHA regulations applies to

18 hazardous materials which you possess and own if they're above

19 certain quantities.  So it's not limited to the plant, it's --

20         THE COURT:  The OSHA regulation is not limited to the

21 plant.

22         MR. BROCK:  Correct.

23         THE COURT:  But was this manual intended to apply

24 outside the plant?

25         MR. BROCK:  The testimony from the witnesses is that

1  this provision regarding to investigations was followed

2  internally, first of all, before this was ever implemented.

3  And further, that once it was implemented they were obligated

4  to follow it with regard to investigations.

5          **THE COURT:**  All right.  So only that portion of the

6  manual relating to investigations is something you feel like

7  you need --

8          **MR. BROCK:**  That's correct.

9          **THE COURT:**  -- to rely on.

10         **MR. NASSIF:**  Judge, I don't agree that the witnesses

11  said that this applied to the spill.  I think you should have

12  to lay a foundation with the witness.

13         **THE COURT:**  All right.  I'll allow this in if a

14  proper foundation is laid with respect to the investigation.

15  Otherwise, the objection will be sustained.

16         All right.  Then, Exhibit 514.  This is a 1992 letter

17  relating to the Vintage Pipeline.  What is the Vintage

18  Pipeline?

19         **MR. ALEXANDER:**  Your Honor, the Vintage Pipeline, you

20  may remember the map that -- well, you probably don't

21  remember -- but the Vintage Pipeline is right next to the

22  methanol line.

23         **THE COURT:**  Oh, okay.  Okay.

24         **MR. ALEXANDER:**  Don't hold me to this -- it's about

25  20 feet away and parallel to the methanol line in the location

1   where the methanol line was leaking.

2          One of the reasons we want this document is it simply

3   explains that the Exxon Line 59 became the Vintage Line.  Exxon

4   sold it to Vintage.  And so it's the same line.  And so we

5   wanted to make clear to the jury that we're talking about the

6   same line.

7          **THE COURT:**  Okay.  Mr. Merrill or Mr. Nassif?

8          **MR. ALEXANDER:**  And once again, it's Exxon reviewing

9   the drawings and so forth for --

10         **THE COURT:**  And this pipeline, this Vintage Pipeline,

11  is in the corridor we're talking about.

12         **MR. ALEXANDER:**  Absolutely.  Like I said, it's

13  20 feet away from the methanol line.

14         **MR. UNIDENTIFIED:**  Or there about.

15         **THE COURT:**  Mr. Nassif?

16         **MR. NASSIF:**  Judge, this is just a general document

17  between Vintage and Exxon Mobil talking --

18         **THE COURT:**  It doesn't sound like it's terribly,

19  terribly important but it's --

20         **MR. NASSIF:**  It doesn't -- I mean the relevance is --

21  what relevance doesn't it have?  We're not going to argue that

22  the pipelines inside the Exxon corridor weren't supervised by

23  Exxon.  And this is just a document between Exxon and Vintage.

24  It has nothing to do with the methanol line.

25         **MR. ALEXANDER:**  We've got to explain to the jury that

1    the Vintage line and the Exxon line are the same, and that's

2    what this document does.

3              **THE COURT:**  Okay.  All right.

4              **MR. NASSIF:**  Well, it's marked on the documents as

5    the Vintage line.

6              **MR. ALEXANDER:**  Well, it's sometimes marked as the

7    Exxon line, and other times it's marked as Vintage.  That's the

8    problem --

9              **THE COURT:**  All right.

10             **MR. NASSIF:**  What's the relevance of this document?

11   It's on the drawing --

12             **THE COURT:**  I think we've spent more time arguing out

13   it here than it's probably worth.  I'll overrule the objection

14   to Exhibit 514.  And I think that takes care of the exhibit

15   objections unless either side has something else they need to

16   go back over and revisit at this point.  Hopefully, not.

17             For the Plaintiff?  Mr. Nassif?

18             **MR. NASSIF:**  Judge, we received I guess yesterday a

19   number of demonstrative exhibits from the Defendants.  And as

20   you know, Judge, we agreed to lay a foundation for our

21   demonstrative exhibit before we used it in front of the jury.

22   I don't have that agreement from the Plaintiffs.  In fact, we

23   think there are a number of things in their exhibits that are

24   flat out wrong.  So they ought to be required to lay a

25   foundation before they use them.  And so that's an issue.

1          And I would say that the number of demonstrative

2   exhibits, Judge, are approximately six or seven.

3          **THE COURT:**  I'm sorry.  The number of what?  I didn't

4   catch that.

5          **MR. NASSIF:**  Demonstrative exhibits.  Separate

6   demonstrative exhibits are approximately six or seven.

7          **THE COURT:**  That the Defendants have?

8          **MR. NASSIF:**  Yes.

9          **THE COURT:**  All right.

10          **MR. NASSIF:**  That we looked at -- I looked at this

11   morning, which I think they delivered to us yesterday.

12          **THE COURT:**  All right.  Mr. Brock?

13          **MR. BROCK:**  We'll agree to lay a foundation

14          **THE COURT:**  Okay.  I gathered you'd do that.

15          **MR. NASSIF:**  So with that agreement they're not going

16   to use them in the opening statement I presume.

17          **MR. BROCK:**  Right.

18          **THE COURT:**  That's correct.  Okay.

19          **MR. NASSIF:**  All right.

20          **THE COURT:**  All right.

21          **MR. NASSIF:**  And Judge, I need to revisit.

22          **THE COURT:**  Yes, sir.  Go ahead.

23          **MR. NASSIF:**  To get these cleared up, Judge, so we'll

24   speed like the devil when it comes on Monday.

25          I raised this issue with Mr. Marshan (phonetic).

1  When we did the motion in limine on number -- when we revisited

2  you, the ones you had taken under advisement, I raised with him

3  the motion in limine Number 7, which my notes indicate, your

4  Honor, you believed was the motion that had to do with

5  restricting us from raising issues relating to prior bad

6  conduct.

7        And when we argued that, Judge -- and I have the

8  transcript from February 6th -- when we argued that, the Court

9  said that we could put into evidence other instances where

10 lines were hit.  And your comment was, "Not if they're outside

11 of the Houston area but if they involve these parties."  And I

12 just wanted to clarify that to -- that's sort of fair game for

13 us to talk about other incidents, related incidents, with these

14 parties and other lines that were hit.

15        **THE COURT:**  In this vicinity.

16        **MR. NASSIF:**  In the Houston area.

17        **THE COURT:**  In the Houston area.  Mr. Alexander, did

18 I not say that or --

19        **MR. ALEXANDER:**  No, I don't think -- that's not the

20 way I understood your ruling at all, your Honor.  If they can

21 claim that we hit other lines in these corridors down there at

22 the relevant point of time, you know, maybe he could do that.

23 But the idea that some -- I can't speak for Martin K. Eby, but

24 the idea that some Brown & Root crew working on some unrelated

25 project somewhere in the city of Houston hit a line when we

1    weren't even operating any construction equipment, it's

2    undisputed we weren't operating any construction equipment on

3    this job.  It's highly prejudicial --

4            **THE COURT:**  Okay.  All right.  Here's what --

5            **MR. ALEXANDER:**  We may end up having to try every

6    other possible incident in which we had problem.

7            **THE COURT:**  Right.  We're not going to do that.  And

8    here's -- let me try to express it again what I thought, and

9    that anything having to do with incidents in this corridor I

10   think -- I guess with respect to the -- well, the pipelines

11   owned or operated by these parties in this corridor is fair

12   game.  Anything having to do with the project itself, the CWA

13   project, I think is fair game.  And so now I'm not sure what

14   else you want to get in or want to talk about that's outside

15   that parameter.

16           **MR. NASSIF:**  Judge, you reviewed that.  I have the

17   transcript here.

18           **THE COURT:**  Okay.  And I don't dispute that that's

19   what I said, okay, but --

20           **MR. NASSIF:**  You did define a geographic area.

21           **THE COURT:**  Right.

22           **MR. NASSIF:**  You said in the Houston area.

23           **THE COURT:**  I said the Houston area --

24       **(Voices overlapping)**

25           -- and so here I've been focusing on the corridor.

1          **MR. NASSIF:**  Right.

2          **THE COURT:**  Is that what your issue is here?

3          **MR. NASSIF:**  Well.

4          **THE COURT:**  You want to get into something that's

5   related -- that occurred in the Houston area?

6          **MR. NASSIF:**  Yes, your Honor.

7          **THE COURT:**  Involving --

8          **MR. NASSIF:**  It may have been --

9          **THE COURT:**  -- these parties?

10          **MR. NASSIF:**  Some may have been in the corridor; some

11   may have been outside the corridor.  But they're all within the

12   Houston area involving these parties only.  I remember the

13   Court making a distinction.  We're not talking about other

14   companies and other locations.

15          **THE COURT:**  Right.

16          **MR. NASSIF:**  Things like that.

17          **THE COURT:**  Mr. Brock?

18          **MR. BROCK:**  Judge, my recollection was, and perhaps I

19   misunderstood, but my recollection was that it was not just

20   these parties but these people.  In other words, if there was a

21   project that Ben Bennett (phonetic) was an inspector on, that

22   might be different than KBR.  As Mr. Alexander said, KBR is a

23   big company and they do a lot of work around here.

24          I'm not aware of any incidents involving Eby.  If he

25   has something, then you know I think we're entitled to it to

1  know what he's talking about so we can at least determine and

2  argue meaningfully to the Court whether or not it is related or

3  whether there's some distinction.

4        **THE COURT:**  Yeah, yeah.  Well, yeah.  It's hard for

5  me to talk about this in a vacuum.  I mean I was trying to give

6  some general guidelines or guidance to the parties, and without

7  knowing exactly which people we're talking about involving and

8  which instance and what timeframe, you know, if you can help

9  me --

10        **MR. NASSIF:**  Yeah.  Judge, and I think I helped you

11  the last time --

12        **THE COURT:**  I'd rather not rule on a pig in a poke.

13        **MR. NASSIF:**  I will certainly lay a foundation that

14  the people that were -- that I'm going to ask about would have

15  been the people --

16        **THE COURT:**  Surely you've asked this question or

17  these questions in depositions.

18        **MR. NASSIF:**  Yes, your Honor.

19        **THE COURT:**  And it's no secret to the parties, you

20  know, what instances you're going to talk about.

21        **MR. NASSIF:**  For example, the inspector on this site

22  testified about other CWA projects he was on where lines were

23  hit.  And he was the inspector.  So to use Mr. Brock's example,

24  we have an example of that.

25        **THE COURT:**  Okay.

 1          **MR. NASSIF:**  Where he was on the site.  I will only

 2    ask him if it's a project they were on in the Houston area that

 3    they had some supervisory position or whatever it is.

 4          **THE COURT:**  All right.

 5          **MR. NASSIF:**  Some other type position that they had.

 6          **THE COURT:**  All right.  I think that's appropriate to

 7    draw the line there.  The people that you ask questions about

 8    need to have had some personal involvement, and the incident

 9    needs to be somewhere in the Houston area.  Does that clarify?

10    Does that take care of you?

11          **MR. NASSIF:**  It does, Judge.

12          **THE COURT:**  All right.  Okay.  Mr. Brock?

13          **MR. BROCK:**  He got to revisit one, so we're going to

14    ask you to revisit one.

15          **THE COURT:**  Okay.  I'm going to call a halt to this

16    pretty soon, but go ahead.

17          **MR. BROCK:**  But before we do, Judge, one housekeeping

18    issue.

19          **THE COURT:**  Yes.

20          **MR. BROCK:**  We had mentioned last time that one of

21    the former employees of Celanese or one of the employees of

22    Celanese that acted as the corporate representative is no

23    longer employed.  We have now determined that he is in the area

24    but he has travel plans and plans to be out of the state when

25    we would call him in our case as we anticipate.  We've talked

1  to counsel and I think have come to an agreement that we should

2  just use portions of his deposition.

3              **THE COURT:**  All right.

4              **MR. BROCK:**  And so we'll mark that and give it to you

5  by the middle of next week.

6              **THE COURT:**  All right.

7              **MR. NASSIF:**  That's fine with us.

8              **THE COURT:**  That sounds good.

9              **MR. BROCK:**  And in that regard there's one other

10  witness, David Vance, who is outside the subpoena range.  We're

11  going to mark some short sections of his and get that to you as

12  well.

13              **THE COURT:**  All right.

14              **MR. MERRILL:**  And I'll have to take a look at those.

15  I'm not sure whether we would agree to that.

16              **THE COURT:**  All right.  If there are issues on that

17  you can --

18              **MR. MERRILL:**  Yes.

19              **THE COURT:**  -- bring them to my attention.

20  Hopefully, you can work that out.

21              **MR. MERRILL:**  Okay.

22              **MR. BROCK:**  Revisiting the one issue.

23              **THE COURT:**  All right.

24              **MR. BROCK:**  Judge, an issue that has arisen

25  previously, specifically related to the *Collins* case, and that

1    is, the use of experts that are no longer going to be called in

2    this case and whether their testimony can be used somehow or

3    the other to bind or use as admissions against interest.  When

4    we were here before Mr. Alexander and I had a little

5    disagreement on whether we may or may not call these people.

6              **THE COURT:**  Yeah.

7              **MR. BROCK:**  We've now clarified that.  We have

8    de-designated those people; and, accordingly, we think that any

9    prior testimony by them does not come in.  Mr. Vie is prepared

10   to argue that issue very briefly if the Court would allow him

11   to do so.

12             **THE COURT:**  All right.  I'll hear Mr. Vie.

13             **MR. VIE:**  Could I indulge the Court and just have a

14   very short break before I do that?

15             **THE COURT:**  Okay.

16             **MR. VIE:**  And I apologize.

17             **THE COURT:**  That's fine.

18             **MR. VIE:**  I will go as fast as possible --

19             **THE COURT:**  We have been going quite a while.  We'll

20   take about a ten-minute break.

21             **THE MARSHAL:**  All rise.

22        **(Recess taken from 12:26 p.m. to 12:37 p.m. / Parties**

23   **present)**

24             **THE MARSHAL:**  All rise.

25             **THE COURT:**  Have a seat everybody.  All right.

1    Mr. Vie, you have the floor.

2         **MR. VIE:**  Thank you, your Honor.

3         This goes back again to motion in limine Items

4    Number 9 and 10 that the Defendants have brought forward about

5    using experts that we might not call.  And what I understood,

6    at least one of the grounds the Plaintiffs had suggested, was

7    wanting to use the deposition for the purposes of confirming

8    the accuracy of their experts' opinion; in other words, an

9    opinion we had from an expert was similar.

10        And then they had cited the *Collins* case.  The Court

11   took it under advisement and then said at the last hearing

12   based on the *Collins* case was inclined to accept that as an

13   appropriate use of the expert.

14        Two things.  One is that we -- I've gone back and

15   looked at the *Collins* case some more and cases citing it.

16   Another case that the Plaintiffs had relied on, the *U.S. versus*

17   *Life* (phonetic), it was not an expert in the sense that it was

18   a person who had been retained or specially employed by the

19   party to use at trial.  It was a surveyor who went out and did

20   an investigation, and it's a lot of what the Court has heard

21   about this morning, people who are retained to do a job and go

22   out and give a report to somebody.

23        And what we're focused on here rather is the unique

24   situation of an expert who is specially retained to give

25   testimony in a case and then, as Mr. Brock said, with respect

1    to these two we have de-designated them as people we do not

2    intend to call at trial.

3          None of the other Circuits follow the reasoning in

4    *Collins,* first, is one thing I've found out.  And their idea,

5    which I believe is the case is true, is that with respect to

6    these experts that you employ to assist you at trial and to

7    testify at trial, they're not under your control.  They're

8    supposed to be experts who come in and give an opinion under an

9    area of expertise, and they're not the same thing as a marine

10   surveyor that you send out and say, "Survey the ship and send

11   me a report."  They're not even the same as Arcadis, which we

12   were talking about earlier.  They're supposed to be people who

13   because of their expertise are available to give opinions to

14   the jury that would be helpful but are bound by their opinions

15   and their training and not under the control of a party who

16   would say, "I'm telling you what to say."

17         So the other courts have said, you know, they're

18   really not agents such that their statements are admissions

19   against interest.

20         **THE COURT:**  But we're not in other circuits, counsel.

21         **MR. VIE:**  And I understand that.

22      **(Laughter)**

23         But one of the things that they have done in

24   distinguishing the *Collins* case is say that they don't believe

25   *Collins* is a per se rule; that every expert is an agent and

1  that *Collins* had a statement on the record that that person was

2  an agent.  We don't believe that these individuals are an

3  agent; in fact, we've de-designated them.

4       The second part now is that having de-designated them

5  there's another line of cases.  And that is, what is the

6  potential prejudice to us in the Plaintiff using the testimony

7  of an expert that we've de-designated?

8       And the courts have said that there are two real

9  concerns.  One is -- and that's the understanding that I have

10  of what the Plaintiffs intend to do -- is trying to use the

11  evidence to discredit the Defendant and bolster the Plaintiffs.

12  It's, obviously, cumulative in the Court's balancing analysis.

13  It's cumulative testimony.  They already have the opinion from

14  the expert.  They want to use a de-designated expert to bolster

15  that opinion by saying isn't it true that this other expert had

16  that same opinion?

17       That's a small point compared to the other issue,

18  which they call an explosive question of prejudice, and the

19  right to say it's explosive, and that is, what if the jury

20  figures out that this was a person formerly retained by the

21  Defendant and that a jury may not understand and may come to

22  believe that the Defendant's counsel is somehow hiding evidence

23  or has not disclosed evidence that it had an obligation to

24  disclose, because at one point it had retained this person?

25       And so there's a case from the Eleventh Circuit, for

1  example, *Peterson versus Woolly* (phonetic), where they say,

2  "Well, the trial court erred in permitting the counsel to

3  elicit the fact that this expert had belonged to the

4  Defendant."  Well, of course, that's what the Plaintiffs would

5  want to do if they want to be able to say this was somebody

6  that they had hired before, and his opinion was the same as

7  yours; isn't it true he agreed with you?  They want to

8  discredit us and bolster the opinion by letting the jury know

9  that he was formerly retained by us.

10       **THE COURT:**  How is that situation different than the

11  situation where, say, you have a former manager or officer of

12  your company and he makes an admission and then he's fired and

13  no longer employed by the company?  I mean his admission made

14  while he was an agent of the company is still binding on the

15  company, isn't it?  And if that's the case, how is that

16  different from this situation where you've de-designated your

17  expert?  At the time he made this statement he was your expert,

18  right?

19       **MR. VIE:**  True.  I mean the example that the Court

20  gives where a person is truly an agent by virtue of being an

21  officer or a director or a designated representative; and at

22  the time it could be argued it's within the scope of the agency

23  when they give the statement.

24       And they're making a distinction between that and the

25  expert, first off, because most courts don't agree that

1   automatically an expert retained --

2           **THE COURT:**  Other courts make that distinction.

3           **MR. VIE:**  Other courts make that distinction.

4           **THE COURT:**  Right.

5           **MR. VIE:**  So experts retained to testify at trial are

6   not automatically your agents that you control.  But the second

7   thing is that the rule -- if you look at the language of the

8   actual rule, it talks about the opposing party's right to learn

9   the opinions of a person who has been specially retained for

10  the purpose of testifying and will testify at trial.  So many

11  courts say as soon as the issue is that the person will not

12  testify at trial, different considerations apply under the

13  rule.  Because the rule says, for example, you can discover the

14  opinions and the background of the person who will testify at

15  trial.

16          And in fairness to the Court and its question, then

17  the courts have to make a distinction between those that are

18  de-designated before they give a report or give a deposition

19  and after.  But they clearly give the right to the parties to

20  de-designate; there is a right to de-designate.

21          And the question for the Court is not a pure

22  admission one; it's a prejudice one.  And I would certainly

23  suggest, and these cases suggest, that the prejudice of a

24  retained expert is different than perhaps the prejudice of a

25  former employee who you discharge, who you may have discharged

1  for reasons relating to the case or may have discharged for

2  reasons wholly unrelated.

3          And the concern of these courts here is that the

4  prejudice that could result from a jury learning that this

5  expert that they're hearing the testimony from that is being

6  offered by the other side had previously been employed by this

7  person and then de-designated, the same reason that we don't

8  get into all these who you didn't call but could have called

9  type of thing, the implication to the jury that you've somehow

10  hidden evidence, you had an obligation.  Which we don't have an

11  obligation to offer; we have the right to de-designate; and

12  that that could destroy credibility absolutely in front of a

13  jury far beyond what they gain by doing it.

14          Because what they gain by doing it in some cases

15  people are trying to get a free ride.  They don't have an

16  expert and they want to use yours.  That's not the case.  They

17  have competing experts.  They just want to bolster that

18  testimony by showing that we have an expert and, thereby,

19  somehow discredit us because we don't want to call that witness

20  any more and have chosen to disqualify them, have chosen to de-

21  designate them.

22          And so they're saying in that context the potential

23  prejudice that the jury would learn that this was a formerly

24  employed expert vastly outweighs what is cumulative evidence

25  anyway; now, your opinion such and such agreed with it.  Or in

1  one case, wouldn't you agree that this person was the

2  preeminent person in the field, that kind of bolstering.

3         So it has very minimal relevancy.  It has very

4  significant potential prejudice.  And for that reason most

5  courts under a balancing test excuse it.  And I think both of

6  those -- there's other factors that might apply, but I think

7  both of those factors apply here:  The cumulative nature of it,

8  because they have those experts of their own; and the

9  prejudicial effort.

10         **THE COURT:**  Thank you, Mr. Vie.

11         Mr. Dawson?

12         **MR. DAWSON:**  Briefly, your Honor.  They spent the

13  morning arguing that Arcadis -- everything that Arcadis said

14  should come in because it's an admission of a party opponent.

15  Arcadis is in no different position than their experts that

16  they hired and then don't want to use at this point.  If it's,

17  again, good for the goose, it's good for the gander.

18         **THE COURT:**  Are you going to have testimony from

19  Arcadis?

20         **MR. DAWSON:**  I don't believe we are.  I don't believe

21  we'll call them.

22         **MR. UNIDENTIFIED:**  No.

23         **MR. DAWSON:**  We're not.  So we're in the same

24  position.  And they've, you know, successfully gotten to use

25  all the statements saying because we hired them as an expert in

1  that field -- they weren't a testifying expert but they were a

2  company that has expertise in the area -- because we hired them

3  they're our agent; therefore, it's an admission of a party

4  opponent and the Court ruled in their favor on that.  You can't

5  have it both ways.

6      Secondly, and we went over this the last time, our

7  experts are entitled to say, "You bet the people that were

8  hired by the Defendants agree with me, and here's where they

9  agree with me."  They're entitled to say that and they're

10 entitled to rely upon the testimony that was give by their

11 experts.  We argued about this the last time.

12     And then finally, we are entitled to say that, you

13 know, if they don't call a witness -- they had an eyewitness.

14 Let's just, you know, take it outside the expert.  If they had

15 had an eyewitness and they don't call them, we're allowed to

16 comment on that to the jury in closing argument.  You didn't

17 hear testimony from so-and-so and so-and-so that they had

18 control over.  And it's no different in this case.

19     Now, I don't know that we need to go into the fact

20 that they de-designated them, and I don't think that we intend

21 to do that.  But we are entitled to show the jury where they

22 had testimony of their expert and was their expert at the time,

23 and it supports whatever position that we're taking in this

24 case.  And again, the case on point we believe is controlling.

25     **THE COURT:**  Mr. Brock?

1          **MR. BROCK:**  Here's my concern, Judge.  Mr. Nassif

2    stands up and asks an expert, "Isn't it true that Mr. Escuchen

3    (phonetic) agrees with your opinion?"  And he says "yes."  Then

4    we have to go back to the Escuchen deposition and cross examine

5    the expert on exactly what was said in the interpretation of

6    that to draw a conclusory statement by counsel or some other

7    witness that this is what that witness is saying rather -- it

8    really makes it -- or requires us, essentially, then to have to

9    come back and try the testimony of that person who has now been

10   designated.

11         And so because certainly my interpretation of what a

12   witness may mean with certain testimony is probably going to

13   vary in certain instances from the way Mr. Nassif may

14   characterize it or some other expert.  And so accordingly --

15         **THE COURT:**  All right.  But you're free to call that

16   witness, right?  I mean if you want to.  You don't have to

17   continue with your de-designation.  You can re-designate if

18   it's -- I mean, you know, I understand it's an awkward position

19   to be in.

20         But at this point I'm not convinced that I need to

21   change the ruling.  I understand the witness has now been

22   de-designated but I don't believe the *Collins* case really turns

23   on that particular factor.  So I'm going to continue with my

24   ruling on that issue.

25         **MR. ALEXANDER:**  Well, your Honor, I think at a

1 minimum they ought to have to lay the foundation for it. We

2 can't have Mr. Nassif standing up in opening statement and

3 saying, "You're going to hear testimony that our expert relied

4 on this expert that they didn't like any more so they

5 de-designated him."

6    **MR. DAWSON:** Well, what we say in opening statement,

7 again, we say at our peril. If we don't get the evidence in,

8 we don't get the evidence in and make them pound us in closing

9 that we didn't get it in. But in terms of what the experts --

10 they'll have a chance -- you know, if we say, for example,

11 "Mr. Expert, isn't it true that Mr. Escuchen agrees with you,"

12 if they want to, you know, make an objection, don't think

13 that's specific enough, they can do that at the time.

14    **THE COURT:** Yeah. Mr. Brock?

15    **MR. BROCK:** And I don't mean to belabor the point,

16 Judge. But the problem, for instance, is our experts were

17 asked opinions for which they're not qualified. For instance,

18 Mr. Koteric (phonetic) was asked about whether he thought a

19 pipe had corrosion on it. He's not a metallurgist. They want

20 to stand up and tell this jury that an expert has been

21 de-designated, offered an opinion which is favorable to them,

22 when in fact he wasn't qualified to render that opinion

23 beforehand and was not offered from us -- I'm sorry -- we did

24 not offer that testimony or offer him --

25    **THE COURT:** For that purpose.

1          **MR. BROCK:**  -- for that purpose.

2          **THE COURT:**  Well, you'll be free to show that and

3    undercut it that way.  But I'm going to maintain my ruling on

4    that point.

5          All right, counsel.  We've been here quite a while.

6    A few other little minor things.

7          **MR. UNIDENTIFIED:**  One housekeeping matter.

8          **THE COURT:**  Yes.

9          **MR. UNIDENTIFIED:**  We would ask the Court to invoke

10   the rule with respect to witnesses.

11         **THE COURT:**  I presume the other side would ask for

12   the same?

13         **MR. ALEXANDER:**  Um.

14         **THE COURT:**  What about with respect to experts?

15         **MR. DAWSON:**  Experts and I think a single corporate

16   rep for each party are excused from the rule, as I understand

17   it.

18         **THE COURT:**  Mr. Alexander?

19         **MR. ALEXANDER:**  That's my understanding as well.  I

20   also would -- I spoke to Mr. Nassif about it -- at one time

21   they had a records custodian from my company, from my client on

22   their witness list.  That's Lynette Adams (phonetic).  And I

23   understand that she's excused from the rule.

24         **MR. DAWSON:**  That's correct.

25         **THE COURT:**  All right.  Very good.  Very good.  All

1  right.  One minor thing.  I've looked over the -- I spoke to

2  you, in general, about the voir dire, said either side will

3  have 20 minutes.  I'm just, basically, going to ask the

4  questions about whether or not any panel member knows any of

5  the parties or the lawyers or the witnesses; and then just some

6  general questions with regard to, you know, their ability to

7  serve.  I will not get into their familiarity with the issues

8  that might be presented in the case, figuring that counsel can

9  probably deal with that more effectively than I can or as

10  extensively as you might need to.

11         One of the questions both sides propose are something

12  like:  Are you familiar with Taylor Bayou, Clear Lake or the

13  Armand Bayou Nature Preserve?  That strikes me as a pretty

14  general type question.  I'll probably ask whether there's

15  anybody who lives in the area or perhaps owns property in the

16  area just to get that out.  But if you want to go into any

17  other detail on that subject, I'll leave that to counsel.  All

18  right.

19         **MR. ALEXANDER:**  Your Honor, if I might say.

20         **THE COURT:**  Yes, sir.

21         **MR. ALEXANDER:**  If I understand what you're planning

22  on doing in terms of asking questions, it really strikes me

23  that 20 minutes a side is a pretty small amount of time to talk

24  to --

25         **THE COURT:**  How about 30?

1          **MR. ALEXANDER:**  Thirty?  Thank you.

2          **THE COURT:**  All right.  I'll give you 30 on both

3     sides, and I was thinking the same thing to be honest.  So

4     we've got 30 minutes both sides voir dire and an hour each side

5     for opening statement.  Hopefully, we'll come over in the

6     morning, the lawyers and everybody will assemble at 9:00

7     o'clock.  And then I think just us lawyers, and then we'll

8     bring the jury in whenever they're ready, generally what,

9     9:30 or 10:00?  Something like --

10         **THE CLERK:**  They'll come when you call them.

11         **THE COURT:**  Okay.  All right.  Well, we'll probably

12     have them up here then within half an hour or so after we

13     start.  Hopefully, we can pick the jury in the morning and

14     start with opening statement in the afternoon.

15         All right.  Anything else?  I'm always reluctant to

16     ask that question in a room full of lawyers.

17         For the Plaintiff, anything?

18         **MR. DAWSON:**  No, your Honor.  I think we've

19     accomplished a lot today. We appreciate the Court's time.

20         **THE COURT:**  Very good.  Anything for the Defendants?

21         **MR. BROCK:**  Not on my behalf.  And once again, thank

22     you for all your time.

23         **THE COURT:**  All right.  All right.

24         **(Counsel thank the Court)**

25         Thank you-all.  All right.  The Court will be in

1    recess.  See you-all Monday morning.

2              **THE MARSHAL:**  All rise.

3         **(This proceeding was adjourned at 12:54 p.m.)**

<u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>March 10, 2009</u>

        Signed                                            Dated

*TONI HUDSON, TRANSCRIBER*